In re TMI LITIGATION CASES
CONSOLIDATED II.

This Document Relates to: All Plaintiffs.

Civil Action No. 1:CV–88–1452.

United States District Court,
M.D. Pennsylvania.

April 2, 1996.

Arnold Levin, Philadelphia, PA, Lee C. Swartz, Hepford, Swartz & Morgan, Harrisburg, PA, for Levin—1704 plaintiffs.

Dusan Bratic, Bratic & Portko, Dillsburg, PA, Louis M. Tarasi, Jr., Tarasi & Johnson, P.C., Pittsburgh, PA, for Tarasi—350 plaintiffs.

Peter J. Neeson, LaBrum & Doak, Philadelphia, PA, for Neeson—4 plaintiffs.

Robert S. Mirin, Harrisburg, PA, for Mirin—1 plaintiff.

Shawn A. Bozarth, Harrisburg, PA, for Bozarth—1 plaintiff.

Joseph D. Shein, Philadelphia, PA, for Shein—2 plaintiffs.

Alfred H. Wilcox, Pepper, Hamilton And Scheetz, Philadelphia, PA, Fred Speaker, Camp Hill, PA, Lewis S. Kunkel, Jr., Pepper, Hamilton & Scheetz, Harrisburg, PA, for General Public Utilities Corp., Babcock & Wilcox Co., Pennsylvania Electric Co., Jersey Central Power & Light Co., Metropolitan Edison Company, McDermott Incorporated, Raytheon Constructors Inc., Burns and Roe Enterprises, Inc. and Dresser Industrial Valve and Instrument Division of Dresser Industries, Inc.

Charles B. Zwally, Michael D. Reed, Mette, Evans, Evans & Woodside, Harrisburg, PA, Augustine V. Cheng, Associate General Counsel, Office of the General Counsel, New York City, for George Colbert.

## MEMORANDUM

RAMBO, Chief Judge.

Presently before the court are a number of unresolved evidentiary and discovery matters. On February 12–16 and March 1, 4–5, 1996, the court conducted a "second round" [1] of *in limine* hearings related to Defendants' motions to exclude certain of Plaintiffs' expert witnesses. Initially, it was contemplated that this second round would be devoted solely to Plaintiffs' medical causation experts. Due, however, to time constraints and scheduling difficulties during the first round of hearings, issues relating to some of Plaintiffs' dose experts were carried over into the second round. All *in limine* hearings are now complete, as is all briefing on outstanding discovery and evidentiary matters. Accordingly, the instant memorandum will reach the merits of the following issues: (1) whether Plaintiffs' supplemental expert reports, filed subsequent to the deadlines for filing expert reports, are admissible pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure; (2) whether the court should reconsider its January 5, 1996 ruling with respect to the proffered testimony of Vladimir Shevchenko; (3) whether, in light of further briefing on the rate of error issue, the court finds the Wing cancer incidence study to be scientifically reliable and therefore admissible; and (4) whether Plaintiffs' experts Olga Tarasenko, David Lochbaum, Bruce Molholt, Theodor D. Sterling, Luis Fajardo, Thomas H. Winters, and Sigmund Felix Zakrzewski should be permitted to testify pursuant to the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3d Cir.1994).[2]

### I. *Plaintiffs' Filing of Expert Reports*

Defendants have objected, both in their filings and during the *in limine* hearings, to the admission of supplemental expert reports filed by Plaintiffs subsequent to the court

---

1. The "first round" of hearings was conducted in November 1995, and focused upon Plaintiffs' dose experts.

2. As the facts are well known to the parties, the court will not reiterate them again here. The factual background of this case is set forth more fully in this court's memorandum of law dated January 5, 1996.

ordered filing deadlines. For the most part, the court has avoided piecemeal rulings on this issue opting instead to make one uniform ruling. *But see In re TMI*, Mem.Op. (M.D.Pa. November 9, 1995) (granting Defendants' motion *in limine* as to certain untimely filed expert reports). The issue is now ripe for disposition. A brief background discussion will place matters in context.

## A. *Case Management History*

The timeliness issue has recurred in many settings within this litigation and has been particularly troubling to the court. Historically, the court has encountered significant difficulty in keeping the parties adhered to any case management order. As a result, there have been close to a dozen "case management orders." 7/10/92 Proposed Schedules of Plaintiffs and Defendants for Taking Cases to Trial; 6/15/93 Case Management Order (setting jury selection for 7/6/94); 11/12/93 Revised Case Management Order (moving jury selection to 10/3/94 at the request of parties); 5/13/94 Order Amending Case Management Schedule (moving jury selection to 4/13/95); 7/28/94 Order (granting Plaintiffs' request for further amendment of pre-trial schedule); 10/14/94 Order (further amending pre-trial schedule at Plaintiffs' request, and noting that absent extreme and compelling circumstances no further amendments will be entertained); 10/19/94 Order (directing parties to submit final joint case management schedule in response to correspondence from counsel); 11/3/94 Order (adopting parties' final joint case management schedule, noting that said order is binding and that it will not be amended absent extreme and compelling circumstances); 5/8/95 Order (moving jury selection to 6/3/96). Much to its own detriment, the court has been flexible and accommodating with respect to the pre-trial schedule.

In November 1994, having grown weary of the parties' inability to comply with set deadlines and fearing that the instant action would languish, the court ordered the parties to draft a final joint case management sched-

ule. On November 3 the court adopted the schedule proposed by the parties and again indicated that the schedule would not be altered absent extreme and compelling circumstances. On May 8, 1995, the court issued an order supplementing the November 1994 case management order to place the case on the June 1996 trial list. Since the entry of the May 8 order, the court, although permitting minor alterations to the schedule, has denied any motion to amend that would effectively remove the case from the June 1996 trial list.

The captioned action, involving approximately 2,000 Plaintiffs, was consolidated under one case number in 1988. To an extent, circumstances beyond the court's control, such as the filing of interlocutory appeals and Congress's amendment of the Price Anderson Act, have stymied the prompt resolution of this action. Nevertheless, a review of the docket reveals that the test cases's torpid progression toward trial is due in part to the parties' willingness to stipulate to extensions of time and alterations of the case management schedule and the court's historical willingness to accommodate such requests.[3]

## B. *Plaintiffs' Expert Reports*

Defendants object to the admission of all of Plaintiffs' expert reports and supplemental affidavits filed subsequent to the court ordered filing deadlines. Although tedious, the following review of Plaintiffs practice in filing expert reports is warranted.

Pursuant to an order dated May 13, 1994, Plaintiffs were to file the expert reports of James Gunckel, Richard Webb and Ignaz Vergeiner not later than August 1, 1994. This order also directed that expert reports on medical causation were to be filed not later than September 1, 1994 and that expert reports on punitive damages were to be filed not later than October 1, 1994. On August 1, 1994, Plaintiffs filed the 6/94 report of Ignaz Vergeiner ("TMI Treatise 1"), and the 5/26/94 and 8/1/94 affidavits of Douglas Crawford–Brown. On August 4, 1994, Plaintiffs

---

**3.** It should be noted that often the alterations to the case management schedule were for the purpose of conducting additional discovery. *See,* *e.g.* 5/13/94 Order; 7/28/94 Order; 11/3/94 Order.

filed the 8/1/94 preliminary report of Richard Webb entitled "A Preview Short Synopsis." Thus, the report of James Gunckel was not timely filed on August 1, and the August 4 filing of the Webb "Preview" was both untimely and in contravention of Rule 26(a)(2) of the Federal Rules of Civil Procedure ("The report shall contain a *complete* statement of *all* opinions to be expressed and the basis and reasons therefor ...."). The court was remiss in not striking these filings immediately and, in temporarily overlooking these rule violations, the court may have unwittingly encouraged Plaintiffs' improper conduct. The record reflects that these 1994 filings were only the first in a long stream of improper and untimely filings.

On September 15, 1994, one and one-half months after the filing deadline, Plaintiffs filed the 7/6/94 Affidavit of Vladimir Shevchenko. On November 3, 1994, the court entered the final joint case management schedule. This schedule extended the deadline for Plaintiffs' filing of dose and medical causation expert reports to March 1, 1995.[4] On March 1, Plaintiffs filed the expert "reports"[5] of the following experts: Armentrout, Crawford-Brown, Gunckel, Hinrichesen, Lochbaum, Shevchenko, Vergeiner, Webb, Wing, Fajardo, Winters, Zakrzewski. On March 14, without leave of court, Plaintiffs supplemented their March 1 filing with the reports of Shevchenko, Tascaev, Kozubov, Popov, Portman, Tarasenko, and Snigiryova. On March 15, again without leave of court, Plaintiffs supplemented their March 1 filing with the report of Bruce Molholt. Finally, on March 29, without leave of court, Plaintiffs filed a third supplement to the March 1 filing adding to the reports of Shevchenko and Za-

krzewski. Thus, as of April 1995, Plaintiffs had late-filed a significant portion of their expert reports on dose and medical causation.

In February 1995, the court issued a preliminary memorandum of law related to Defendants' motion *in limine* to exclude Dr. Molholt's 4/8/93 report, and ordered limited additional briefing with respect to certain of the *Paoli II* factors.[6] *In re TMI*, Mem.Op. at 22 (M.D.Pa. February 14, 1995) ("[T]he court has invited the parties to respond concisely to the issues raised ... this is not an invitation to deluge the court with paper. Clear, concise, relevant information will assist the court in reaching a just resolution; likewise, the submission of frivolous or irrelevant information will be frowned upon.") As exhibits to their court-ordered filing, Plaintiffs submitted several new expert reports (5/1/95 Molholt; 4/24/95 Kerman; 5/2/95 Kerman; 2/27/95 Crawford-Brown). In September 1995, Plaintiffs, again without leave of court, untimely filed the reports of Theodore Sterling and Ronald Kerman.

The next battery of Plaintiffs' expert reports were filed as exhibits to their opposition to Defendants' motion *in limine* to exclude Plaintiffs' dose experts. On October 25, Plaintiffs filed as exhibits the updated reports of the following experts: Vergeiner (two separate affidavits dated 10/18/95), Armentrout (10/10/95 Aff.; 10/22/95 Aff.), Gunckel (8/23/95 Aff.), Shevchenko (10/6/95 Aff.), Wing (10/19/95 Aff.), Crawford-Brown (10/20/95 Aff.), Molholt (9/8/95 Aff.; 9/14/95 Aff.). On October 31, with leave of the court,[7] Plaintiffs' supplemented the record

---

4. The court notes that insofar as this order has retroactive application it cures the timeliness defects in Plaintiffs prior filings.

5. In large part, these filings are not "reports" in the traditional sense of the word. For many of Plaintiffs' experts, a "report" consists of a compilation of affidavits updated over time. *See, e.g.,* Report of Douglas Crawford-Brown (2/27/95 Aff.; 8/1/94 Aff.; 6/10/94 Aff.; 5/26/94 Aff.); Report of Steven Wing (2/25/95 Aff.; 2/23/95 Aff.; 1/12/95 Aff.; 10/31/94 Aff.; 6/13/94 Aff.; 1/94 Aff.; 3/16/93 Aff.).

6. The court directed the additional briefing to clarify the parties' positions and to assist the

court in reaching a final determination on the admissibility of the proffered testimony of Dr. Molholt.

7. Through a Memorandum and Order dated October 19, 1995, the court re-opened discovery from October 20 to October 30 for the purpose of granting Plaintiffs access to original plant data stored at the Emaus Street repository. The court granted Plaintiffs motion to compel despite the fact that "[a]fter sitting on their right to access these materials for nearly one decade, Plaintiffs now, one week before their brief on the *in limine* issues is due and after the formal close of discovery, request that Defendants be compelled to produce the aforementioned documents merely

with the following affidavits/new reports: Armentrout (9/20/95 Aff.; 5/11/95 Aff.), Blanch (10/31/95 Aff.), Kerman (10/30/95 Aff.), King (10/30/95 Aff.), Reyblatt (10/31/95 Aff.), Shevchenko (10/6/95 Aff.), Kozubov (9/12/95 Aff.), Smirennyi (10/30/95 Aff.), Wing (10/27/95 Aff.). On January 16, 1996, as exhibits to a brief in opposition to Defendants' motion to compel, Plaintiffs filed the following supplemental affidavits: Crawford–Brown, Ornstein, Purcell, Reyblatt. Finally, during February 1996, Plaintiffs filed the following supplemental affidavits without leave of court: Wing (10/19/95 Aff.; 1/26/96 Aff.; 1/31/96 Aff.; 2/7/96 Aff.), Kozubov (1/30/96 Aff.), Armentrout (2/1/96 Aff.), Milhollin (5/5/96 Aff.), Griffin (1/30/96 Aff.), King (2/16/96 Aff.).

### C. *Discussion*

 Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the disclosure of expert testimony. In relevant part Rule 26 provides as follows:

> **(B)** Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

because it would not be inordinately difficult for Defendants to do so." 10/19/95 Order at 3. Plaintiffs offered the court no explanation as to why they had failed to view this material during the formal discovery period. *Id.*

Pursuant to its granting the motion to compel, the court allowed Plaintiffs "to supplement their

Fed.R.Civ.P. 26(a)(2)(B). Rule 37 provides for self-executing discovery sanctions where a party fails to disclose information subject to the mandatory disclosure provisions of Rule 26(a). Specifically, Rule 37 states:

> **(1)** A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1). While the Rule itself does not specifically delineate the types of non-disclosure that are harmless, the advisory notes to the 1993 amendment of Rule 37 do provide some guidance as to the type of non-disclosure envisioned as harmless:

> Limiting the automatic sanction to violations "without substantial justification," coupled with the exception for violations that are "harmless," is needed to avoid unduly harsh penalties in a variety of situations: *e.g.,* the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the names of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures. In the latter situation, however, exclusion would be proper if the requirement for disclosure had been called to the litigant's attention by either the court or another party.

Advisory Notes to 1993 Amend.Fed.R.Civ.P. 37(c). Although the captioned action was filed prior to the most recent amendment of Rules 26 and 37, the bulk of expert discovery has been conducted subsequent to the 1993 amendments. Accordingly, the court finds that Rules 26 and 37, as amended in 1993, are binding upon the parties.

 The Court of Appeals for the Third Circuit, interpreting Rule 37 narrowly, "has been reluctant to approve the exclusion of testimony unless a party has (1) revealed

brief in opposition to Defendants' motion *in limine.*" The court allowed Plaintiffs to supplement the record to the extent that something in the original strip chart data proved helpful to their case. Plaintiffs were not granted permission to supplement the record with anything beyond the scope of the "new" original plant data.

previously undisclosed evidence when trial was either imminent or in progress, or (2) acted in bad faith." *Diflorio v. Nabisco Biscuit Co.,* 1995 WL 710592 at *2 (E.D.Pa. Nov. 13, 1995). Moreover, the Third Circuit has held that lack of diligence does not constitute bad faith. *Paoli II,* 35 F.3d at 793. Through *Paoli II,* the Third Circuit signaled the continuing applicability of *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894 (3d Cir.1977), to a district court's Rule 37 analysis. Pursuant to *Pennypack,* a court must consider:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order[,]

*Paoli II,* 35 F.3d at 791 (citing *Pennypack,* 559 F.2d 894), when determining whether to impose Rule 37 sanctions. The discussion below will support the court's finding that (1) Defendants would be prejudiced by the admission of certain of the untimely reports [8] insofar as the rigorous pre-trial schedule precludes them from having sufficient time to prepare to cross-examine on the late-filed reports; (2) Defendants are unable to cure the prejudice insofar as the court is unwilling to further alter the pre-trial schedule because such alteration would necessitate postponing the trial date; (3) waiver of the Rule 37 sanctions would disrupt the orderly trial of this case as well as a multitude of other cases on the court's docket; and (4) Plaintiffs repeated violation of numerous orders of this court, failure to seek leave of court before filing untimely reports, and "covert" filing of additional reports as exhibits to a variety of unrelated motions rather than "overtly" making supplemental filings, rises to the level of bad faith.

■ In *Paoli II,* the Third Circuit reversed the district court's exclusion of testimony contained within an untimely filed expert report. *Paoli II,* 35 F.3d at 792. The Third Circuit provided the following explanation for finding error with the district court's ruling:

> We have great difficulty with the district court's rulings. The prejudice to the defendants here is extremely minimal. Plaintiffs properly identified Dr. DiGregorio as a witness by the March 17 deadline, thus the defendants knew that he was going to testify. They were also aware of the general substance of his testimony and even some of the specifics of his plan for medical monitoring.... Moreover, defendants were provided with all of the specifics of Dr. DiGregorio's proposed medical monitoring plan on April 18, only a month after the district court's deadline, four months before the schedule trial date, and 60 days before the deadline the district court has set for ending discovery. Thus, the defendants has abundant time to depose Dr. Digregorio regarding the specifics of his proposed program before the discovery deadline, and the district court could easily have extended the deadline to provide the defendants more time.

> . . . . .

> [W]e have reversed an exclusion where, as is the case here, there was only a slight deviation from pre-trial notice require-

---

**8.** To develop the record during the *in limine* hearings, the court permitted testimony with respect to some untimely filed reports. This testimony was uniformly subject to Defendants' continuing objections based upon untimeliness and failure to include the methodology or information in the expert's original report. The court's ruling as to what testimony would be permitted subject to the continuing objection was based upon its consideration of the following factors: (1) when Defendants acquired knowledge of the new information in proximity to the commencement of the relevant *in limine* hearing; (2) whether Defendants' had an adequate opportunity to depose the witness as to the new and untimely materials; (3) whether, in light of the complex nature of the testimony, allowing Defendants wide latitude to cross examine at the hearings would cure any potential prejudice; (4) whether Defendants had sufficient knowledge of the methodology/information at the time of the hearing to conduct an adequate cross-examination of the witness. The court will make its ultimate ruling on Defendants' continuing objections in the context of its discussion of Defendants' motion *in limine* to exclude Plaintiffs' medical causation experts.

ments, and admitting the witness was likely to cause only slight prejudice to the defendants, who were already aware of the basic substance of the witness' testimony. *Id.* The situation facing this court can be distinguished from the above-referenced *Paoli II* scenario on a number of levels. First, all of the untimely supplemental reports at issue here were filed after the formal close of discovery. Where, as here, discovery was formally open for nearly one decade, and where the court readily accommodated requests for enlargement of the deadlines on a number of occasions, Plaintiffs' failure to timely file expert reports without any justification is inexcusable. Second, although it appears that the witnesses whose reports are at issue were identified in a timely fashion, the substance of their testimony was largely unknown to Defendants. The timely filed "preliminary"[9] reports of many of Plaintiffs experts bear little resemblance to the supplemental reports that Plaintiffs would have this court admit. *Compare* 4/8/93 Molholt *with* 3/13/95 Molholt *and* 5/1/95 Molholt.[10] Moreover, these supplemental filings continued to be made up to, during, and after both rounds of *in limine* hearings.

Were the instant action a less complex lawsuit, the court would be more inclined to find Plaintiffs' Rule 26 violations harmless. *See In re Ford Motor Co. Bronco II Products Liability Litigation,* 1996 WL 28517 (E.D.La. January 23, 1996) (noting that "[c]ompliance with the disclosure requirements is particularly important in complex cases"); *United States v. Davis,* 1993 WL 525591 at *1 (D.R.I. April 16, 1993) ("At trial in this case, expert witnesses are expected to testify about complex scientific and technical issues.... To adequately prepare for trial, each side must have detailed, final information regarding opposing expert witnesses' testimony and the theories and documents upon which the expert will rely.") Under the unique circumstances of this case, however, Plaintiffs' Rule violations have prejudiced Defendants' ability to adequately prepare their case for trial, and have effected this court's ability to manage the case. *In re Ford Motor Co.,* 1996 WL 28517 at *2 ("Plaintiffs noncompliance has caused inconvenience to both the defendant and the court. As a result, it is difficult to find plaintiffs' conduct "harmless" within the meaning of Rule 37(c)(1) and to unconditionally exempt plaintiffs from the harsh sanction which Rule 37 advocates."). The administrative ramifications of this court's decision to set a June 1996 trial date are enormous. Accommodating the parties for two rounds of *in limine* hearings required clearing the court's calendar for most of November 1995, part of February 1996, and part of March 1996.

**9.** This court's research has revealed only one written opinion confronting the issue of whether a "preliminary" report meets the disclosure requirements of Rule 26. In *Smith v. State Farm Fire and Casualty Co.,* 164 F.R.D. 49, 53–54 (S.D.W.Va.1995), the district court made the following observations:

> A "preliminary" report is not contemplated by the Rule, which calls for "a complete statement of all opinions to be expressed." ... These reports fulfill none of the purposes of the Rule as they leave Defendants open to unfair surprise. If Defendants depose each expert to avoid the risk of ambush, no resources are conserved. The reports refer to massive amounts of documents as the basis for the opinions which are expressed in vague terms, with few specific references.

*Id.* This court is in agreement with the *Smith* court. As such, it finds Plaintiffs' arguments that Defendants have not been prejudiced by Plaintiffs' Rule violations, to exhibit a profound misunderstanding of the policy considerations underlying the disclosure requirements of Rule 26.

As the purpose of mandatory disclosure is to streamline the discovery process and avoid unnecessary depositions, the fact that Plaintiffs' reports were "preliminary" and thus incomplete, thereby necessitating lengthy depositions, supports the proposition that Plaintiffs flagrantly violated Rule 26 and that Defendants were prejudiced by Plaintiffs violation of the Rule.

**10.** The court finds this to be particularly relevant in light of the Third Circuit's observation in *Paoli II* that the plaintiffs there "had little to gain from the month delay in provision of the additional material." *Paoli II,* 35 F.3d at 793. Here, Plaintiffs had much to gain from delaying the final disclosure of the expert opinions. By examining each expert's series of affidavits chronologically, it is readily apparent that methodologies grew more "scientific", new graphs and charts were added, new information was integrated into the methodology, etc., in direct response to legal challenges raised in a variety of Defense motions. Thus, by making their untimely supplemental filings, Plaintiffs were able to mold their expert reports to meet Defendants' legal challenges.

Further, the court has cleared its calendar for the months of June, July and part August 1996 for trial in this matter. The court's docket, aside from the instant action, is substantial. Making the resolution of this case a priority has caused numerous other litigants, who are equally deserving of their "day in court," to be inconvenienced.

The court is resolute in its belief that had it done nothing to prod this case to trial, motions for further extension of the discovery deadlines would still be being filed. Nevertheless, because the court has taken such drastic measures to ensure that this matter does finally go to trial, the court must be somewhat rigid in its adherence to the pre-trial schedule. Knowing in advance that this would be the case, the court permitted the parties to participate in drafting the final pre-trial schedule. The court adopted the parties' proposed schedule in its entirety and set a firm trial date. Further, the court repeatedly admonished the parties that once the schedule was put in place it would not be altered absent extreme and compelling circumstances. *See, e.g.* 10/14/94 Order; 11/3/94 Order. Finally, the court has not been entirely inflexible with all deadlines, allowing alteration of the final pre-trial schedule where such alteration would not effect the set trial dates.

Related and equally important to the question of whether the untimely filings should be admitted is Plaintiffs' consistent inability to articulate any substantial justification for their inability to timely file complete expert reports. Plaintiffs' counsel simply argue that there has been no prejudice to Defendants because trial is still several months away, and that they are doing everything within their power to comply with the court's rigorous pre-trial schedule. (Pls.' Findings at 69 ("Even assuming that this information was submitted untimely, the Court can find no prejudice to the defendants").) These responses are unavailing as the court finds that Plaintiffs have offered no substantial justification for their untimely filings, and admission of certain of Plaintiffs' supplemental filings would prejudice Defendants. *R.C.M. Exec. Gallery Corp. v. Rols Capital Co.,* 1996 WL 30457 at *2 ("defendants are prejudiced

if they are unable to rely on court-imposed deadlines, and judicial efficiency is impaired if such deadlines are ignored with impunity"); *Heflin v. City of Chicago,* 1996 WL 28238 at *8 (N.D.Ill. Jan. 22, 1996) ("Defendants argument that their is still time to [conduct discovery] ... before trial is unavailing. The court will not circumvent Rule 37's inducement for full compliance with Rule 26(a)(2) and disrupt ... trial preparation without substantial justification.").

In *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 546 (5th Cir.1996), the United States Court of Appeals for the Fifth Circuit recently upheld a district court's exclusion of incomplete and untimely filed expert reports under circumstances similar to those here. Finding that the district court did not abuse its discretion in excluding the expert testimony, the Fifth Circuit Court made the following observations:

> [Plaintiff] even appears at times to admit that it did not comply with the discovery order by stating that it was "impossible" to comply and that their experts "did all they could do" under the circumstances. The reasons for noncompliance, however, are relevant to the separate issue of whether the sanction imposed was appropriate. On the other hand, a violation of an order is a violation of an order, regardless of the reasons therefor.

*Id.* at 571 n. 46. In commenting upon the propriety of excluding the testimony as a sanction for the discovery violations, the appellate court noted that "[w]hile a continuance would have given [the defendant] ... more time to review the late disclosures, such a measure 'would neither punish [plaintiff] ... for its conduct nor deter similar behavior in the future.'" *Id.* at 573 (quoting *Bradley v. United States,* 866 F.2d 120, 126 (5th Cir.1989)).

The United States District Court for the Eastern District of Pennsylvania has also recently confronted the issue of untimely supplemental expert reports filed in complex tort litigation. Denying the plaintiffs' motion to submit supplemental expert reports after the close of discovery, the district court found that "the process of producing new

expert reports, deposing the new experts, producing responsive reports from defense experts, and subjecting the new experts to in limine scrutiny would unduly delay the final disposition of these cases." *In re Paoli Railroad Yard PCB Litigation,* 1996 WL 24751 at *2 (E.D.Pa. January 24, 1996). The court noted that the plaintiffs had failed to demonstrate that it was impossible for them to have been more diligent in conducting discovery while discovery was open and that the "[p]laintiffs had from 1987 to 1992 to find a medical expert who could render an opinion in their cases." *Id.*

The court finds the facts of the instant case to be as compelling as both *Sierra Club* and *Paoli.* Plaintiffs have consistently flouted filing deadlines with impugnity, and have failed to meet the most basic Rule 26 disclosure requirements.[11] Moreover, Plaintiffs have had from 1979 to 1995 to find expert witnesses to support their case. As such, the court finds suggestion that Plaintiffs experts have been pressed for time to ring hollow. Additionally, as the court discussed at length above, the court finds that admission of the untimely filed supplemental reports would prejudice Defendants and further disrupt the efficient functioning of this court.[12] Based upon the foregoing, the court finds adequate grounds, pursuant to Federal Rules of Civil Procedure 26 and 37, to exclude from the record certain supplemental expert reports filed without leave of court subsequent to the court ordered filing deadlines. *(See also* Pls.' Answer to Defs' Motn. to Preclude any Additional Reports or Related Testimony from Richard Webb at 4 ("it is the flouting of a

court's scheduling order that typically produces a severe sanction").) Looking solely at the conduct of Plaintiffs' counsel, the court finds it appropriate to exclude all expert reports filed subsequent to court-ordered filing deadlines. This, however, would result in an effective dismissal of much of Plaintiffs' case, and such a result is unduly harsh to Plaintiffs themselves who have had nothing to do with counsels' flagrant abuse of the discovery process and disregard of court orders.

■ The court has fashioned sanctions pursuant to Rule 37(b) and (c) which account for counsels' unacceptable conduct without unduly punishing Plaintiffs' for the transgressions of counsel. This court's power to fashion such sanctions is broad. The court has already discussed the nature its power to impose sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure. Underscoring this statutory authority is the court's inherent authority to impose sanctions for misconduct. As the Supreme Court observed in *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991):

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose

11. Plaintiffs have had difficulty meeting virtually every filing deadline in the past year. It is commonplace for the court to receive a telephone call from Plaintiffs' counsel at approximately 4:45 p.m. on the day of a filing deadline indicating that Plaintiffs' will be unable to get their filing to the Clerk's office before the close of business. On numerous occasions, the court has permitted Plaintiffs' to deliver their filings directly to chambers after hours and on weekends. The court made this gesture to avoid what it believed to be the unduly harsh alternative of refusing to accept the filing. The court presumes that, on occasion, even the most diligent attorney will encounter circumstances beyond her control which make it unable for her to meet a filing deadline. Plaintiffs' counsel have, with their consistent inability to meet deadlines, challenged this court's presumption that their failure to

make timely filings was truly due to circumstances beyond their control.

12. While there are technically still three months until jury selection, the relative proximity to trial becomes apparent when viewed through the case management schedule. Two of the remaining three pre-trial months will be used by the parties for briefing on summary judgment motions. In the remaining month before trial, while the court rules on summary judgment motions, the parties will likely be deeply enmeshed in final trial preparation work. It would be unreasonable, in light of this compressed schedule, to expect Defendants to digest and incorporate into their case the array of supplemental filings that Plaintiffs' seek to have admitted.

silence, respect, and decorum, in their presence, and submission to their lawful mandates." These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their won affairs so as to achieve the orderly and expeditious disposition of cases."

*Id.* at 43, 111 S.Ct. at 2132 (citations omitted). " 'By controlling an attorney's conduct, the court fulfills the duty it owes to its own preservation, to members of the general public, and to those members of the profession who do cooperate and are in sympathy with proper administration of the law.' " *Grace v. Center for Auto Safety,* 155 F.R.D. 591, 601 (E.D.Mich.1994) (footnote omitted). Because of the potency of the sanctions available, the imposition of sanctions is a matter that cannot be taken lightly by the court. *Chambers,* 501 U.S. at 44, 111 S.Ct. at 2132. Further, the court must exercise restraint in imposing sanctions. *Id.*

This court's January 5 order detailed the court's rationale for excluding certain "new" expert reports which Plaintiffs sought to file on the eve of the first round of *in limine* hearings. Upon publication of this order, there could be no question in the minds of Plaintiffs' counsel that continued filing of supplemental affidavits containing new methods and information, without leave of court, was prohibited. As such, the court will exclude from the record all supplemental affidavits filed after January 5, 1996.[13] Fed. R.Civ.P. 37(b) and (c). All supplemental affidavits and reports filed subsequent to the March 1, 1995 filing deadline but prior to January 5, 1996, and whose admissibility has not previously been ruled upon by this court, shall be admitted.[14] Additionally, the court will issue a separate order to show cause why monetary sanctions should not be imposed

against certain of Plaintiffs' counsel. Counsel will be afforded the opportunity to respond at that time. *Chambers,* 501 U.S. at 50, 111 S.Ct. at 2136 (court must "comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees").

## II. *Defendants' Motion for Reconsideration of the Court's January 5, 1996 Memorandum as it Pertains to Vladimir Shevchenko*

■ On January 22, 1996, Defendants filed the instant motion for reconsideration. The motion has been briefed by the parties and is ripe for disposition. "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985) (citation omitted), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Therefore, a court may properly grant a party's motion for reconsideration in any of the following circumstances: "(1) the development of an intervening change in the law, (2) the emergence of new evidence not previously available, or (3) the need to correct a clear error of law or prevent a manifest injustice." *Cohen v. Austin,* 869 F.Supp. 320, 321 (E.D.Pa. 1994) (citations omitted). Because Defendants have raised important, though not entirely availing, challenges to the court's January 5, 1996 ruling, the court will reach the merits of Defendants motion for reconsideration.

### A. *Dr. Snigiryova's Cytogenetic Analysis*

Defendants contend that the court made a number of factual and legal errors in ruling on the admissibility of Professor Shevchenko's testimony regarding the Snigiryova cy-

---

**13.** With respect to these filings the court finds the imposition of monetary sanctions upon counsel to be an ineffective sanction. *Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536, 1544 (11th Cir.1993) ("When lesser sanctions would be ineffective, Rule 37 does not require the vain gesture of first imposing these ineffective lesser sanctions.")

**14.** To the extent that Defendants have not had the opportunity to depose an expert witness or cross-examine that witness at the *in limine* hear-

ings as to a methodology that the court has now found to be admissible, Defendants will be permitted to promptly notify the court of the expert's name and the methodology at issue. The court reserves the right to revisit this issue upon receipt of such notification from Defendants. However, the court believes that Defendants have had the opportunity to depose or cross-examine Plaintiffs' experts as to all proffered testimony which the court has ruled to be admissible.

togenetic analysis. The court will address these assignments of error *seriatim*.

### 1. Factual Error Regarding Hershey Medical Center Controls

■ Defendants argue that the court misapprehended certain hearing testimony to reach the erroneous conclusion that Dr. Snigiryova compared her study results with a Hershey Medical Center control group. Defendants and Plaintiffs agree that the court incorrectly identified the Hershey control group with the Snigiryova cytogenetic analysis rather than with Dr. Tarasenko's immune study. The court's review of the record indicates that the court did incorrectly associate the Hershey Medical Center control group with the Snigiryova study. The issue then, is whether this factual error by the court alters its legal ruling with respect to the Snigiryova cytogenetic analysis.

In the January 5 ruling, this court noted the following:

> [W]ith respect to the proffered cytogenetic testimony, Defendants raise an issue related to the propriety of the control group. Defendants contend that the cytogenetic analysis is flawed because Professor Shevchenko and Dr. Snigiryova did not employ a contemporaneous and geographically proximate control group.... Plaintiffs did, however, present testimony which showed that the historical Russian controls used by Professor Shevchenko and Dr. Snigiryova had background dicentric counts virtually identical to those of a control group measured at Hershey Medical Center in Hershey, Pennsylvania. (Tr. at 705.) The court finds that Plaintiffs have come forward with sufficient evidence to demonstrate that their control group, while not contemporaneous and geographically proximate, is adequate.

*In re TMI Cases Consolidated II*, 911 F.Supp. 775, 816 (M.D.Pa.1996). The court must now determine whether, absent corroboration with a Pennsylvania control group, the control group utilized by Dr. Snigiryova was adequate. Defendants contend that Dr. Snigiryova's control sample was inadequate and improper. Plaintiffs, to the contrary, argue that the literature supports the use of non-contemporaneous, geographically diverse control groups. Specifically, Plaintiffs refer the court to their *in limine* exhibit 72, *Cytogenetic Study in Lymphocytes from Children Exposed to Ionizing Radiation After the Chernobyl Accident*, 319 Mutation Research 55, 57 (1993) ("*Chernobyl Accident*"), and their *in limine* exhibit 73, *Novel Biodosimetry Methods Applied to Victims of the Gioania Accident*, 60 Health Physics 72, 75 (1994) ("*Gioania Accident*"). The court finds Plaintiffs reliance on these articles to be somewhat misplaced as the articles lend only tangential support to the argument that Plaintiffs advance.

The *Chernobyl Accident* study, which used a geographically diverse (Italian) control group in its cytogenetic analysis of Byelorussian children, noted the following:

> We are fully aware of the fact that these "control" children are characterized by a very different ethnic, life style, health, and dietary background. However, the problem could not be otherwise solved due to the circumstance that no children from other areas of Byelorussia were sent to Italy and that even their health and dietary conditions would have been different from those of the subjects analyzed. Unfortunately, no cytogenetic data concerning children from the same localities prior to the accident are available.

*Id.* at 57. This statement supports Plaintiffs argument insofar as it demonstrates that a scientific study, that relied on a geographically diverse control group because a geographically proximate control was unavailable, was accepted for publication. The court, however, finds reliance on this study problematic.

First, Plaintiffs have placed no evidence on the record which tends to show that it was difficult or impossible for a geographically proximate control group to be utilized with respect to the instant study. Dr. Snigiryova's report, filed March 15, 1995, offers no explanation as to why she found it necessary to use Russian rather than American control values. It was only following Defendants' *in limine* challenge that Dr. Snigiryova filed a second report, dated September 25, 1995, that addressed the control issue. While Dr. Snigiryova's September report indicates that there is some support in the literature for

her control values, the court cannot help but wonder whether this is merely a *post hoc* attempt to defend the methodology she employed. The court finds the issue of whether Dr. Snigiryova carefully considered the selection of an appropriate control group *prior* to beginning her study to bear directly upon the reliability of her methodology. Were she to have selected a control group because of time pressures related to this litigation, rather than because the group was scientifically the most appropriate control, such a selection would clearly flaw her methodology. A statement made by Dr. Snigiryova in her September report underscores this and other of the court's concerns:

> The aim of our work has not been to conduct extensive cytogenetic examinations of the population living in the neighborhood of TMI. Such work is time-consuming and expensive. The task facing us was to make a conclusion on the presence/absence of the action of radiation as a result of the accident at the TMI nuclear power station by comparing the level of cytogenetic disorders in the population from the examined region and in clinically healthy people living on [sic] the uncontaminated territory.

9/25/95 Snigiryova Rpt. at 1. Although Dr. Snigiryova's stated purpose was not to perform "extensive cytogenetic examinations," Plaintiffs seem to view her study somewhat differently. "Plaintiffs contend that the level of dicentrics in blood drawn from TMI residents, as determined by Dr. Snigiryova, is sufficiently high to conclude that accident exposures caused doses to these individuals in excess of 100 rems." (Pls.' Brief in Op. to Defs.' Motn. *in limine* to Exclude Pls.' Dose Experts at 164.) Dr. Shevchenko has taken a limited study whose purpose was merely to show the presence or absence of chromosomal aberrations, and used the findings to calculate a dose. As will be discussed below, this methodology is scientifically problematic. Moreover, it appears from the quoted statement that Dr. Snigiryova presumed that the TMI area was contaminated. Whether the TMI area was or is contaminated is a central issue in this lawsuit, and a question that has remained largely unanswered in the scientific community for nearly two decades. Accord-

ingly, it would be highly inaccurate and seemingly unscientific to base a study upon the unproven assumption that the TMI area is or was contaminated.

Next, the *Chernobyl Accident* article undermines the validity of Professor Shevchenko's dose estimates based on the cytogenetic study. The summary preceding the article indicates the following: "[d]ue to the very low fraction of dicentrics, because of the time elapsed from the accident and the relatively low doses of exposure, radiobiological dosimetry is not possible for these children." *Id.* at 55. The article goes on to attribute the presence of chromosomal aberrations to the fact that the children have likely been exposed to continuing low-level ionizing radiation remaining from the accident. *Id.* at 59. Thus, as much as this article may lend support to the notion that the use of geographically diverse control groups is proper under certain circumstances, it detracts support from the proposition that Professor Shevchenko or Dr. Snigiryova could make a reliable dose estimate based upon a cytogenetic analysis performed fifteen years after the alleged exposure to radiation.

The court's review of relevant scientific literature has produced no clear guidance as to whether contemporaneous and geographically proximate control samples are essential to a scientifically reliable study. The International Chernobyl Project studies conducted in the aftermath of the Chernobyl accident included dicentric chromosome analyses. Findings of those studies showed that "[t]he frequency of aberrations in control areas was surprisingly high.... Reasons for this high frequency are unclear; however, the background rate of aberrations among different populations has been shown to be variable. *Future studies on this subject are certainly worthwhile.*" International Advisory Committee Technical Report, *The International Chernobyl Project* 298 (IAEA 1991) (emphasis added). This statement seems to be representative of present scientific opinion on this issue. Thus, the court is placed in the uncomfortable position of making a determination as to the propriety of a particular scientific methodology where the relevant

scientific community has yet to reach agreement on that very issue.[15]

Based upon the foregoing, the court must find that the failure to use a contemporaneous, geographically proximate control group goes to the weight of Professor Shevchenko's testimony. This finding is rooted in the court's interpretation of the relevant scientific literature. The court reads this literature to recommend the use of contemporaneous and geographically proximate control groups; however, the court does not find that the absence of such control groups renders a study invalid *per se.* Defendants motion for reconsideration will be denied as to this narrow issue. While the court has found that the choice of control groups has not in itself rendered the cytogenetic analysis scientifically unreliable, the court will discuss below certain aspects of the proffered testimony that the court, upon review, has found to be scientifically unreliable.

### 2. Errors of Law

Defendants contend that the court made several legal errors in evaluating the admissibility of Dr. Snigiryova's cytogenetic analysis. Specifically, Defendants argue that the court erred in ruling that Professor Shevchenko's testimony is admissible in light of the following: (1) pursuant to *Paoli II,* any step that renders the expert's methodology unreliable renders the testimony inadmissible, therefore, Dr. Snigiryova's failure to employ an appropriate control group renders testimony regarding the cytogenetic analysis inadmissible; (2) Dr. Snigiryova's failure to employ the FISH method in her dose reconstruction renders her methodology hopelessly flawed and thus inadmissible; and, (3) the court reached improper conclusions based upon its analysis of several of the *Paoli II* factors. The court's discussion above refutes Defendants' first assignment of error. Discussion of the remaining arguments is necessary.

### a. The Fluorescence In Situ Hybridization Technique

■ The scientific literature pertaining to use of cytogenetic analysis as a method of dose reconstruction supports the proposition that dose reconstruction through cytogenetic analysis becomes less accurate and effective as time progresses following the date of exposure. *See, e.g.,* National Research Council, *Radiation Dose Reconstruction* 59 (National Academy Press 1995) ("*Radiation Dose Reconstruction* ") ("[A]mong the most sensitive markers for radiation exposure is the enumeration of unstable chromosome aberrations. If this marker is measured within a year after exposure there will be little decay and the sensitivity will allow it to serve as a good dosimeter.") The decline in effectiveness as time passes arises because unstable chromosome aberrations disappear over time. Dr. Snigiryova explained in her report that the number of chromosome aberrations will decrease by approximately fifty percent within three to five years following exposure to ionizing radiation. 3/15/95 Snigiryova Rpt. at 1, 7–8. Recently, a technique known as fluorescence in situ hybridization ("FISH") has been developed. The FISH method is more effective than traditional cytogenetic analysis in reconstructing dose when significant time has elapsed since the date of exposure. *Radiation Dose Reconstruction* at 59 ("The disadvantages associated with unstable markers are avoided when stable markers, such as reciprocal translocations measured by fluorescent in situ hybridization, are used.") The method has been described as follows:

In this technique, the DNA is thermally denatured to provide single strands of DNA. These targeted strands are incubated with nontarget DNA probes that bind to the DNA sequences that are homologous. The target DNA is stained, and the nontarget DNA is counterstained. Under a fluorescence microscope the target DNA appears yellow, and the nontarget DNA appears red. In the case of a translocation, the affected DNA strand will appear to be partially red and partially yellow. This method detects only a fraction of the translocations, so that it is

---

**15.** Plaintiffs' would argue that this is the type of factual determination that should be made by the jury, not the court. As uncomfortable as it may be for the court to make this determination, the court would abdicate its role as gatekeeper by passing this decision on to the jury.

necessary to apply a multiplication factor to estimate total translocation frequency. (Defs.' Ex. 155 (Fred A. Mettler, Jr., M.D. and Arthur C. Upton, M.D., *Medical Effects of Ionizing Radiation* 65 (2d ed. 1995).)) Defendants' contend that the court erred in finding Dr. Snigiryova's cytogenetic analysis to be scientifically reliable despite the fact that the court recognized that "[Professor] Shevchenko failed to employ the *only* recognized method for performing dose reconstruction through a cytogenetic method after a long lapse of time." (Defs.' Brief in Supp. of Motn. for Reconsid. at 7.) Plaintiffs' claim that Professor Shevchenko did perform a "supplemental verification" of the results of the cytogenetic analysis using the FISH method. Further, Plaintiffs argue that because the court prohibited testimony on this issue at the *in limine* hearings, the court cannot now base its finding on a lack of record evidence as to this issue.

This issue highlights the problems that the court has encountered in dealing with Plaintiffs' continual "supplemental" reports. The court prohibited testimony on the FISH method at the hearings based upon its finding that the timely filed expert reports of Professor Shevchenko and Dr. Snigiryova did not contain any substantive discussion of a utilization of the FISH method to verify the results of Dr. Snigiryova's cytogenetic analysis. Dr. Snigiryova's discussion of the FISH method in her initial report was confined to the following statements:

> The problem of the estimation of dose radiation using the cytogenetic data is very problematically [sic] in this situation. Firstly [sic] this is connected with a long period after TMI accident. In such situation it seems necessary to estimate stable chromosome aberration in lymphocytes of peripheral blood, using FISH method. . . .

3/15/95 Snigiryova Rpt. at 8. She again briefly raised the issue in response to an *in limine* challenge by Defendants. 2/25/95 Snigiryova Rpt. at 6 ("More detailed information about these people will come from the analysis of frequency of stable translocations using FISH method."). Professor Shevchenko's 2/21/95 "Final" Report briefly alluded to the FISH method as follows:

> The problem of estimation of an absorbed dose on the basis of results of cytogenetic analysis is important. The lymphocytes with unstable chromosome aberrations (dicentrics and rings are referred to this group) are gradually goes out [sic] from peripheral blood because of a renovation of a pool of lymphocytes. . . . The latter figure follows from a ratio between unstable (dicentrics and rings) and stable (translocations) chromosome aberrations revealed by FISH-method. . . . Unfortunately so far we don't know a ratio between stable and unstable chromosome aberrations for persons suffered from TMI accident. . . .

2/21/95 Shevchenko Rpt. at 6–7. In his October 6, 1995 report, filed in response to Defendants' *in limine* challenge, Dr. Shevchenko indicated "[t]he dose estimate of 0.6–2 Gy for this group given in my Final report of February 21, 1995 can be defined more exactly after a cytogenetic analysis of stable chromosome aberrations using the FISH-method." 10/6/95 Shevchenko Rpt. at 22.

The evidence before the court demonstrates that the number of unstable chromosome aberrations decrease over time. The evidence further shows that cytogenetic analysis is a reliable means of reconstructing dose when done shortly after the time of exposure; and, that the FISH method is an accurate means of reconstructing dose when longer time periods have elapsed since exposure. Plaintiffs' experts conducted a traditional cytogenetic analysis on blood samples collected from TMI residents. These blood samples were taken approximately fifteen years after the alleged exposure. Both Dr. Snigiryova and Professor Shevchenko state in their reports that this time lapse is problematic in the context of reconstructing a dose. Both experts also agree that the TMI blood samples should be analyzed using the FISH method to obtain an accurate dose estimate. Contrary to the record evidence, Plaintiffs argue that their experts can quantify the dose of ionizing radiation allegedly received by TMI residents based solely upon the traditional cytogenetic analysis performed fifteen years after the presumed date of exposure.

In its January 5 ruling, the court weighed Professor Shevchenko's failure to utilize the FISH method in favor of excluding the proffered testimony. *In re TMI*, 911 F.Supp. at 813. Nevertheless, based upon the balance of its analysis, the court ultimately found the proffered testimony to be admissible. *Id.* at 816–17. In making this determination, the court relied heavily on Professor Shevchenko's vast experience. Defendants have directly challenged this ruling. Upon reconsideration, the court finds that it erred in ruling that Professor Shevchenko's dose estimates derived from the cytogenetic analysis are admissible. While the court believes that his experience is still directly relevant to his tree study methodology, the court improperly accorded too much weight to this factor with respect to the cytogenetic analysis.[16] The record evidence is uncontroverted. The FISH method is the procedure employed by scientists to accurately reconstruct dose when prolonged periods of time have elapsed since exposure.

■ Neither Professor Shevchenko nor Dr. Snigiryova analyzed the TMI blood samples using the FISH method prior to the November 1995 *in limine* hearings. Their reports indicate that they are presently re-analyzing the blood samples using the FISH method, and that these results will validate their findings from the general cytogenetic analysis. This argument distorts the letter and spirit of the Federal Rules of Civil Procedure beyond recognition. Final reports of

Plaintiffs' dose experts, containing a complete statement of the methodologies employed and the basis for the opinions, were due March 1, 1995. Had Plaintiffs produced the actual findings of a study using the FISH method on the TMI blood samples at the November *in limine* hearings, the court would likely have admitted those findings and allowed Defendants wide latitude to cross-examine.[17] That Plaintiffs only recognized the importance of conducting the FISH analysis after the filing deadlines passed is not sufficient justification for admitting such evidence one year after the filing deadline and four months after the *in limine* hearings on dose concluded.

Based upon the foregoing, the court will grant Defendants' motion for reconsideration with respect to Professor Shevchenko's dose estimates. While Professor Shevchenko will be permitted to testify as to the cytogenetic analysis performed and as to the findings regarding the presence or absence of chromosome aberrations, Professor Shevchenko will not be permitted to give a quantified dose estimate based upon the cytogenetic analysis. The court finds that the methodology employed by Dr. Shevchenko to arrive at his dose estimate is scientifically unreliable when performed fifteen years after the alleged exposure to radiation.

**B.** *Professor Shevchenko's Tree Study*

■ Stated in the most general terms, Defendants challenge the court's ruling as to

---

16. The record before the court demonstrates that Professor Shevchenko's experience is with evaluating the cellular and subcellular effects of ionizing radiation on trees. Further, the court is satisfied that Professor Shevchenko has, through the course of his work in the Soviet Union, observed the morphological effects of ionizing radiation on trees. The court has accorded significant weight to this experience for the purpose of evaluating Professor Shevchenko's tree study. The record does not reflect a similar level of expertise or professional experience in interpreting the results of a cytogenetic analysis. As such, the court was incorrect in finding Professor Shevchenko's practical experience to weigh heavily in its analysis of the scientific reliability of the dose estimates derived by Professor Shevchenko based upon the cytogenetic analysis.

17. The court precluded Professor Shevchenko from offering general testimony regarding the

FISH method at the *in limine* hearings because such testimony was beyond the scope of his timely filed report. It is the court's understanding that Professor Shevchenko was unable to discuss the results of a FISH analysis being performed on the TMI samples because that analysis was not yet complete. The following exchange occurred between Plaintiffs' counsel and the court:

> I think with validation of reliability at issue … that it is appropriate for him to at least discuss why he has confidence in the reliability of his opinion with respect to his regression analysis for the dicentric counts.
> THE COURT: How can … [Defense counsel] cross-examine him on the FISH method when he doesn't have a report on it?
> MR. BERMAN: That is a good question, Your Honor.
> THE COURT: Sustain the objection.
> (11/22/95 Tr. at 1146.)

the admissibility of the Shevchenko tree study testimony is centered upon their assertion that his methodology was scientifically unreliable. Defendants point to Professor Shevchenko's contradictory testimony as to whether he performed a differential diagnosis or examined a control group as evidence that he manufactured the "proper" methodology in response to Defendants' *in limine* challenge. A recent Third Circuit opinion reiterates the standard pursuant to which Professor Shevchenko's tree study must be evaluated:

Under *Daubert's* interpretation of Rule 104(a), a district court facing a proffer of scientific expert testimony must as a preliminary matter assess whether the reasoning or methodology underlying the expert's testimony is scientifically valid. The court accomplishes this "by considering all relevant factors that may bear on the reliability of the proffered evidence. The reliability requirement, however, should not be applied too strictly. Helpfulness to the trier of fact remains the ultimate touchstone of admissibility. If the expert has "good grounds" for the testimony, the scientific evidence is deemed sufficiently reliable. A determination that the expert has good grounds assures that the expert's opinions are based on science rather than "subjective belief or unsupported speculation."

*Holbrook v. Lykes Bros. Steamship Co.*, No. 94–2148, slip. op. at 14, 80 F.3d 777, 784 (3d Cir.1996). Defendants' criticism of Professor Shevchenko's study is accurate and insightful. The court, however, finds that exclusion of the proffered testimony on the grounds urged by Defendants would amount to an overly strict application of *Daubert.* Despite Defendants' argument to the contrary, the court continues to find Professor Shevchenko's experience and expertise to be extremely relevant to the overall analysis of his proffered tree study testimony. As the court noted in its January 5 ruling, "[l]ikely more than any other expert before the court, Professor Shevchenko has had extensive first-hand experience examining the effects of radiation exposure." *In re TMI*, 911 F.Supp.

at 817. Because of his extensive first-hand experience, Professor Shevchenko's observations will be helpful to the trier of fact. Even if Professor Shevchenko were to do nothing more than to verify that he observed radiation damaged trees in the former Soviet Union, and note that the damage he saw in the TMI area was consistent with his observations of tree damage in the former Soviet Union, his testimony would assist the jury in determining whether it is more likely than not that the TMI area was contaminated during the TMI accident. Thus, the court will affirm its prior ruling that Professor Shevchenko's general testimony regarding his comparison of tree damage in the TMI area with tree damage in radiation exposed areas of the former Soviet Union is admissible. Defendants' motion for reconsideration will be denied as to this portion of Professor Shevchenko's proffered testimony.

■ A more difficult question raised by Defendants' motion is whether the court properly admitted Professor Shevchenko's dose estimates based upon the tree study. To rule on this motion, the court again reviewed Professor Shevchenko's deposition and hearing testimony, specifically noting the inconsistencies raised by Defendants. This review indicates that Defendants are correct in their observation that Professor Shevchenko's testimony has changed over time in response to challenges made by Defendants. Most troubling to the court is a statement made by Professor Shevchenko in his February 4, 1996 affidavit.[18] In attempting to refute challenges made in Defendants' motion for reconsideration, Professor Shevchenko argued that his control sample was proper, *inter alia,* because "according to the data from the Hershey Medical Center, the same level of chromosome aberrations has been observed in this region in the control groups as in our control materials." 2/4/96 Shevchenko Aff. at 3. This is the very data that the court *wrongfully* attributed to the cytogenetic analysis. Based upon this statement, it is clear that Professor Shevchenko lacks knowledge of what control groups were actually employed in the Snigiryova cytogenetic analysis. To the extent that this statement iden-

---

**18.** The court admits this affidavit solely for its use in the present discussion.

tifies a possible lack of candor with the court on the part of Professor Shevchenko, the court finds that such is a credibility determination for the jury.

More important for the court at this juncture is what the statement reveals about Professor Shevchenko's methodology for both his tree study an his cytogenetic analysis. Each time Professor Shevchenko offers testimony, whether in a hearing, deposition, report, affidavit or letter, a component of his methodology changes. The most certain thing that the court can say regarding the dose calculations derived from the tree study methodology is that after reading all Professor Shevchenko's reports, deposition testimony, and the hearing transcripts, the court is unable to define the precise steps of his methodology. Each time Professor Shevchenko states his methodology Defendants challenge a component of that methodology and Professor Shevchenko alters the methodology to rebut the challenge. It is axiomatic that such methodological fluctuations are not scientific. *Daubert* and *Paoli II* direct this court to apply liberally the reliability prong of Rule 702 to allow admission of testimony based upon good grounds that will be helpful to the trier of fact. A proportedly scientific opinion that constantly changes merely to avoid critique can hardly be said to be based upon "good grounds." Moreover, the court is unable to find that Professor Shevchenko's vascilating methodology and opinions based thereon will assist the jury in making a determination on any fact in issue.

Based upon the foregoing the court will grant Defendants' motion for reconsideration and reverse its prior ruling with respect to Professor Shevchenko's quantitative dose estimates derived from his tree study analysis. Professor Shevchenko will still be permitted to testify as to the observations he made of damaged trees in the TMI area and as to his comparison of the damage observed here with tree damage at radiation exposed sites in the former Soviet Union.

### III. The Wing Rate of Error Issue

#### A. Background

In its January 5 opinion, the court deferred ruling on the admissibility of the Wing cancer incidence study pending further briefing on the rate of error issue. The court found that it was unprepared to make a final ruling on that issue based upon the evidence and briefing before it. Supplemental briefing on the rate of error issue is complete, and the court is now prepared to rule on the admissibility of the Wing cancer incidence study. At the outset, the court must comment on Plaintiffs' approach to the supplemental briefing. According to Plaintiffs' brief, "to respond to ... [the court's request], plaintiffs provided Dr. Wing with a copy of the portion of the Court's January 5, 1996 Memorandum that addresses Dr. Wing's testimony, opinions and reports ... and have asked Dr. Wing to respond to the Court's directive." Had the court wished to hear further testimony on this issue from Dr. Wing, the court would have directed him to submit an affidavit.[19] Moreover, had the court wanted Dr. Wing to calculate the confidence intervals for his study based upon values that he previously reported, the court

---

**19.** In fact, on March 27, 1996, the court contacted Plaintiffs' counsel and requested that Dr. Wing reword in "laymen's terms" four paragraphs of the "statistical methods" section of his February 25, 1995 report. The court was not confident of its understanding of some of the terminology in this section (e.g. "The models were fit with Poison regression using the GLIM statistical package." *Id.* at 6.), and felt strongly that a complete understanding of this section was important to its analysis. The court is in receipt of Dr. Wing's statement, and is grateful for his assistance in clarifying this section of the report.

With respect to this request for clarification, the court was disappointed to find that despite its correspondence with Plaintiffs' counsel requesting that they refrain from making personal attacks on the court in their filings, Plaintiffs' counsel have elected to continue with this unnecessary and unprofessional practice. (Pls.' Supplemental Filing Provided By Plaintiffs' Expert Dr. Steven B. Wing in Response to Court Request at 1 ("The Court's clerk advised plaintiffs' counsel that the reason the court desired an explanation by Dr. Wing is that the Court is not sophisticated in and knowledgeable about statistical terminology, and therefore, the Court desired that the four paragraphs be explained in language which the Court, as a lay person, might be able to understand.").) The court takes this opportunity to again stress that it frowns upon this practice.

likewise would have made such a request. The method that Plaintiff has employed to respond to the court's request for further briefing is emblematic of the way they have responded to Defendants' challenges to their expert testimony. Additionally, it is the root cause of much of the difficulty that the court has encountered in evaluating Plaintiffs' experts' proffered testimony.

It is necessary to state what the court believed to be the obvious. In its January 5 order, the court directed Plaintiffs' counsel to provide a more concise discussion of the rate of error calculations performed by Dr. Wing during the cancer incidence study. The court did not grant Plaintiffs leave to augment the cancer incidence study. For the purposes of this litigation, the court is not interested in what Dr. Wing might have done if he had more time, what he will do in future studies, or what he would do if he were permitted to change his methodology in response to Defendants' criticism. The court, on the other hand, is very interested in better understanding what Dr. Wing did do when conducting the initial cancer incidence re-analysis. The critical issue presently before the court is whether Dr. Wing made an effort to determine the known or potential rate of error for his study. Plaintiffs have argued in their briefing and presented some evidence at the hearings that Dr. Wing eschews the traditional confidence interval method for calculating error and instead uses another approach. It was the court's inability to completely understand the nature of this "other approach" apparently utilized by Dr. Wing which led the court to order further briefing on the issue. *In re TMI*, 911 F.Supp. at 822 ("the court is cognizant that part of the difficulty in resolving this factor is due to the court's own uncertainty regarding Dr. Wing's standard error calculations ... the court will order Plaintiffs to provide a more direct and substantiated discussion of the error issue"). Unfortunately, rather than taking this opportunity to further educate the court as to their experts' methods, Plaintiffs have used their rate of error brief to criticize the court for its "emphasis" on the rate of error issue.

In their brief, Plaintiffs argue that "Dr. Wing did not calculate the rate of error for his reanalysis for philosophical reasons relating to the scientific purpose of epidemiological studies." (Pls.' Rate of Error Brief at 3.) Plaintiffs contend that Dr. Wing's October 19, 1995 affidavit provides a full explanation of this issue. The October 19 affidavit presents problems in its own right as it is a supplemental report, filed more than six months after the discovery deadline in response to Defendants' *in limine* challenge, which alters Dr. Wing's methodology. As discussed in § I, *supra*, the court has grounds to strike this affidavit pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure. Nevertheless, because the court finds it important to provide a substantive analysis of the rate of error issue, the court will consider the affidavit for the purposes of its analysis.

**B.** *Discussion*

Dr. Wing's explanation of his decision not to perform statistical significance testing on his cancer re-analysis is as follows:

> Abuse of significance testing in epidemiological research is now widely appreciated and discussed. The problem is clearly recognized by one of the defense's experts, K. Rothman, who wrote in an editorial introducing a paper on logical problems with statistical significance testing, "In a century in which science has reveal that molecules an atoms are mostly unoccupied space and that matter is energy anyway, we should be accustomed to having the substance of our scientific foundations dissolve into emptiness. In this issue [of the journal], Greenland perforates the foundations of statistical interpretations used by epidemiologists in just this way." The problems with significance testing ... have been recognized for some time, but have been ignored in the interests of preserving a simple if fallacious method that was inconclusive or spurious.... "Greenland shows us that, despite our reliance on conventional statistics for interpreting our nonexperimental results, *there is no basis for the interpretations usually given to these statistics in nonexperimental settings.*" This is because, in the absence of

randomization of exposure in a fair experiment, it is not possible to distinguish the extent to which test statistics reflect bias or the exposure under investigation.

(B.) For this reason we do not present tests of statistical significance, although they can be calculated based on figures given in the report. Our preference, and one increasingly being recognized as a responsible scientific approach, is to evaluate the statistical evidence in the context of the sensitivity of the findings to changes in assumptions and data, coherence of the evidence with other knowledge, the magnitude of associations, their consistency across groups, and temporal relationships of exposure and effect.

10/19/95 Wing Aff. at 3 (emphasis in Wing Aff.). Based upon this explanation, the court is left to determine whether Dr. Wing's method in evaluating the statistical evidence provides an accurate measure of the known or potential rate of error in his cancer reanalysis. To make this determination, the court must perform a *Daubert*-like analysis to ascertain whether the method employed by Dr. Wing in calculating the rate of error is scientifically reliable.

The rate of error issue is important to Dr. Wing's reanalysis because it assists the court in identifying what inferences can be drawn from his findings. Specifically, a rate of error calculation will help to define the degree to which his findings might be due to random error rather than a causal relationship between radiation exposure from TMI and an increased cancer incidence. To the extent that the results are more likely the product of random error than a true causal relationship, the probative value of the study necessarily decreases. Traditional methods of establishing the rate of error in a study are through the use of standard errors, confidence intervals, and p-values.[20]

Rather than employing one of these standard methods, Dr. Wing opted for a less mathematical approach which "evaluate[s] the statistical evidence in the context of the sensitivity of the findings to changes in assumptions and data, coherence of the evidence with other knowledge, the magnitude of associations, their consistency across groups, and temporal relationships of exposure and effect." 10/19/95 Wing Aff. at 3. Dr. Wing states that he uses this methodology because of his belief, a belief he argues is shared by other epidemiologists, that statistical significance testing is often employed in a dishonest fashion. The court is in agreement with Plaintiffs that there is presently an ongoing dialogue within the relevant scientific community on the issue of significance testing. *See, e.g.,* S. Greenland, "Randomization, Statistics and Causal Inference," 1 Epidemiology 421 (1990). Moreover, the court is aware that the debate has carried over into the judicial arena. The court does, however, differ with Plaintiffs' as to the nature of the dialogue. The court's review of the literature, including the Greenland article, suggests that the focus of the debate is on the weight to accord significance testing when evaluating a study, rather than the question of whether significance testing should be used in the first place. *See* Ref. Man. at 153–54 & n. 82 (citing cases demonstrating the split amongst federal courts on this issue).

**20.** The Reference Manual on Scientific Evidence defines these terms as follows:

*Standard Error* (SE). Indicates the likely size of the sampling error in an estimate. Many authors use the term "standard deviation" instead of standard error.

*Confidence Interval.* An estimate, expressed as a range, for a quantity in a population. If an estimate from a large sample is unbiased, a 95% confidence interval is the range from two standard errors below to two standard errors above the estimate. Intervals obtained this way cover the true value about 95% of the time, and 95% is the confidence level, or the confidence coefficient.

*p-Value.* The output of a statistical test. The probability of getting, just by chance, a test statistic as large as or larger than the observed value. Large p-values are consistent with the null hypothesis; small p-values undermine this hypothesis. However, p itself does not give the probability that the null hypothesis is true. If p is smaller than 5%, the result is said to be statistically significant. If p is smaller than 1%, the result is highly significant. The p-value is also called the significance level.

Ref.Man. at 409, 396, 402.

■■■■ Contrary to the presumption made by Plaintiffs' in their brief, the issue for the court has never been whether Dr. Wing's study produced statistically significant results, whether he calculated 95% confidence intervals, or whether the p-value was 0.5. (Pls.' Rate of Error Brief at 7) ("Since the Third Circuit has not stated a rule of law that a magical level of significance must be shown before an epidemiological study is admissible, Dr. Wing's report and testimony focused more on the helpfulness that his analysis would have to the trier of facts rather than seeking to quantify the rate of error as though such an exercise would have magical significance.") Pursuant to *Daubert* and *Paoli II* this court is required to make an inquiry regarding the known or potential rate of error of any scientific evidence placed before the court. As this court interprets the legal precedent, the inquiry entails making a determination as to whether the known or potential rates of error are so high as to affect the scientific reliability of the evidence. Neither *Daubert* nor *Paoli II* require that a scientist use traditional methods for assessing the known or potential rate of error in their study. Nevertheless, *Daubert* and *Paoli II* do impose an obligation upon the party proffering the expert testimony to present to the court, in a manner in which the court or a jury can readily understand, some evidence of the known or potential rate of error. Further, this court reads *Daubert* and *Paoli II* as suggesting that the ascertainment of a known or potential rate of error by the proffered expert is an important indicia of the scientific reliability of the study. Thus, while a coherent articulation by Plaintiffs of Dr. Wing's rate of error methodology would not have "magical significance," it would go a long way toward assisting this court to properly exercise its gatekeeping function.

■■■■ Plaintiffs' brief fails to provide the discussion expressly requested by the court. Since the court requested the additional briefing, Plaintiffs have filed four new affidavits of Dr. Wing, each of which expand upon his timely filed report. 1/12/95 Wing Aff.

("This affidavit responds to the request for clarification of issues related to the 'known or potential rate of error' "); 1/16/95 Wing Aff. ("This affidavit addresses two issues raised in Judge Rambo's Memorandum of January 5, 1996"); 1/31/96 Wing Aff. ("In previous affidavits to the Court I have attempted to make clear the substance and methods of our research on incidence of cancer following the accident at TMI ... Despite previous work and explanations of methods and results, questions continue to be raised about the scientific work, with the implication that it is biased by our connection with plaintiffs in the case."); 2/7/96 Wing Aff. ("The following graphs present age adjusted cancer incidence trends for the Three Mile Island 10–mile area and comparison rated from the National Cancer Institute's Surveillance, Epidemiology and End Results (SEER) survey.") As the court explained above, Dr. Wing has submitted a formal report and testified at the *in limine* hearings. The scope of his opinion, for the purposes of this litigation, has been defined. It is understandable that Dr. Wing, who has expended significant effort to conduct a re-analysis of the Susser/Hatch data, would want to vigorously defend his study. This is the way that science evolves in the scientific community. Unfortunately, this is not the way scientific testimony is presented in a court of law. Plaintiffs' counsel bore the burden of relaying this distinction to their experts and explaining the way that the court must deal with scientific evidence, regardless of how preposterous the legal methods may seem to a scientist. It is the role of Plaintiffs' counsel, who are well versed in the intricacies of the law, to craft arguments in response to legal challenges raised by Defendants. Dr. Wing's role in this litigation is to provide expert testimony regarding the methodology and findings of the studies he conducted, not to provide legal arguments in response to issues raised in Defendants' filings or the orders of this court.[21]

Insofar as they may be relevant to the instant rate of error discussion, the court will not consider any affidavit filed by Dr. Wing

---

21. Of course, this is not to imply that it would be improper for Dr. Wing to provide technical support to Plaintiffs' counsel and advise them on the scientific aspects of their arguments.

in the aftermath of the November *in limine* hearings.[22] Plaintiffs did not seek and therefore were not granted leave of court to supplement Dr. Wing's report or hearing testimony, and Defendants will have no opportunity to conduct discovery with respect to these untimely filings prior to trial. The court is unwilling to modify the pre-trial schedule and move the trial date to afford Defendants the time to adequately review these late filings. The court will consider untimely affidavits filed prior to the commencement of the November *in limine* hearings to the extent that Defendants had the opportunity to explore these affidavits with Dr. Wing during the hearings.

 The court will approach the rate of error question by examining only the alternative error ascertainment methodology which Dr. Wing claims to have used in conjunction with the timely filed portion of the cancer incidence study. Defendants argue that application of the factors which Dr. Wing deems relevant leads to the conclusion that there is a high rate of error inherent in his re-analysis of the Susser/Hatch data. Specifically, Defendants contend that: 1) contrary to what Dr. Wing testified would be proper, the risk ratios for leukemia incidence do not increase consistently from low dose unit study tracts to higher dose unit study tracts; 2) insofar as Dr. Wings results show an accident related increase of "all cancers" and lung cancer, his findings lack coherence with the known 10 year minimum latency period for solid tumors; and 3) with respect to the "magnitude of associations" factor, Dr. Wing fails to explain how such a large increase in lung cancer is associated with a much smaller increase in "all cancers" (one would expect to see an increase in "all cancers" that corresponds with the increase in lung cancer). (Defs.' Rate of Error Brief at 6–8.)

Upon further review of the Wing re-analysis, the court finds Defendants' argument with respect to the rate of error issue to be compelling. Accordingly, this factor will weigh in favor of the exclusion of the proffered testimony. Prior to its resolution of the rate of error issue, the court found that "[t]he *Daubert/Paoli II* analysis militates slightly in favor of admitting the proffered testimony." *In re TMI*, 911 F.Supp. at 823. Factoring the rate of error issue into this analysis, the court finds the Wing re-analysis to be only marginally scientifically reliable. Nevertheless, marginally scientifically reliable is not unreliable. Thus, vigorous cross-examination, rather than exclusion is proper.

Subject to the exclusions made in this court's November 9, 1995 order regarding Dr. Wing's "new graphs" and the January 5, 1996 memorandum and order regarding the lung cancer testimony, the court will admit the timely filed (2/25/95) Wing cancer incidence study. The court will narrowly construe this ruling. The scope of Dr. Wing's testimony will be limited to the contents of his timely filed report, his deposition testimony, and his testimony at the *in limine* hearing (to the extent that that testimony was not excluded by the January 5 order).

## IV. Defendants' Motion in limine to Exclude Plaintiffs' Medical Causation Experts

On February 12–16 and March 1, 4–5, 1996, the court conducted a "second round" of *in limine* hearings in the captioned action. These hearings centered upon Plaintiffs' medical causation experts, but also included certain of Plaintiffs' dose experts who were unable to be present during the "first round" of *in limine* hearings. The court will evaluate the proffered testimony of each of the challenged dose and medical causation experts pursuant to the *Daubert/Paoli II* analysis set forth in this court's memorandum of law dealing with Defendants' *in limine* challenge to Plaintiffs' dose experts. *In re TMI*, 911 F.Supp. at 786–88.

### A. Dr. Olga Tarasenko

Dr. Tarasenko is a physician and immunologist who is proffered to testify as to the results of an immunological study that she performed upon the blood samples of certain TMI area residents. The report of Dr. Tara-

---

**22.** Excepted from this ruling is the filing that the court requested Plaintiffs to make on March 29, 1996.

senko was initially presented to the court as a component of Professor Shevchenko's report. Through an order dated November 9, 1995, the court prohibited Professor Shevchenko from testifying as to the methodology and results of the Tarasenko study as the court found Dr. Shevchenko unqualified to opine as an expert in immunology.[23] The court further ruled that Plaintiffs could proffer the Tarasenko report at the *in limine* hearings provided that Dr. Tarasenko was produced to offer that testimony. Due to circumstances beyond Plaintiffs' control, Dr. Tarasenko was unable to attend the first round of *in limine* hearings. The court permitted Dr. Tarasenko to offer her dose testimony at the most recent round of medical causation *in limine* hearings.

Dr. Tarasenko performed an immune study on blood samples of selected TMI area residents at the request of Dr. Snigiryova and Professor Shevchenko. (Tr. at 473 ("I received a phone call from Dr. Snigiryova. This doctor called me ... and asked would it be possible to conduct ... an analysis of blood samples by request of Dr. Shevchenko.").) She was provided with a portion of the blood samples that were initially provided to Dr. Snigiryova for her cytogenetic analysis. (Tr. at 520.) According to her report, Dr. Tarasenko conducted a "[c]omparative analysis of immune status characters of persons presumably subjected to ionizing radiation during [sic] TMI accident (group 1), persons participated [sic] in liquidation of consequencies [sic] of Chernobyl accident in 1986 (group 2), control group 3 (Moscow inhabitants), inhabitants of Muslumovo village from South Ural (group 4), inhabitants of a "clean" village of Altai region (group 5) was carried out." 2/15/95 Tarasenko Rpt. at 1. Through her study, Dr. Tarasenko "determined immunological parameters both to cellular immunity and to humoral immunity."[24] (Tr. at 479.) The general purpose of the Tarasenko study was to determine whether the TMI residents exhibited immune system depression, and if they did, to compare their immune system parameters with the immune system parameters of persons in the former Soviet Union who had been exposed to ascertainable doses[25] of ionizing radiation.

Dr. Tarasenko's findings were as follows:

In ... group [one] even average characters substantially differ not only from generally accepted levels of immunocompetent cells but from the levels obtained in control groups....

A sharp disbalance of immunoregulating cells was revealed. This disbalance in combination with the disturbances mentioned above evidences the presence of mixed immunodeficite [sic] status in the persons of group 1.

Such disturbances are observed in the patients who use immunodepressants (widely used antibiotics, aspirin and other medicines can be referred to this group of chemicals) and suffer from cancer, autoimmune diseases, syndrom [sic] of chronic weariness and others. It is undoubtedly necessary to carry out a dynamic examination of all persons of this group, regular observation of their immune status, medical and prophylactic measures.

2/15/95 Tarasenko Rpt. at 2. Attached to the report are ten tables, unaccompanied by explanatory text, which set forth the statistical or mathematical results of Dr. Tarasenko's comparative study. 2/15/95 Tarasenko Rpt. tables 1–10. At the hearing, Dr. Tarasenko provided detailed and often confusing testimony regarding the meaning of these tables.

---

**23.** The court found that Dr. Shevchenko lacked the technical knowledge to comment upon the methodology that Dr. Tarasenko employed in conducting her immune study. Because of his inability to discuss the technical nuances of the study methodology, the court found that Defendants' would be denied the opportunity to vigorously cross-examine regarding the immune study methodology.

**24.** The term "humoral immunity" refers to non-cellular immunity. (Tr. at 479.)

**25.** Dr. Tarasenko testified that, with one exception, the twenty Chernobyl liquidators comprising group two of the study were exposed to approximately 25 rems of ionizing radiation. (Tr. at 514, 529–31.) The Muslumovo residents who comprised group 4 were known to have been exposed to up to 100 rems of ionizing radiation. (Tr. at 510, 530.)

(*See generally,* Tr. at 486–87, 496–515, 556–70.) According to Dr. Tarasenko, following the submission of her report, which contains no discussion of possibility or probability that the immune parameters observed in the TMI group were induced by radiation, she discussed her findings with Professor Shevchenko. (Tr. at 523.) Dr. Tarasenko testified that she "told to [sic] Dr. Shevchenko that such changes are possible as a result of the effect of eradiation [sic] and of a considerable magnitude, doses similar to those that were received by inhabitants of Muslumovo village and also by inhabitants in Altai." (*Id.*) In addition, Dr. Tarasenko noted that the results of her study were transmitted to Professor Shevchenko prior to the time that she received data regarding the TMI group's medical history. (Tr. at 524.) After studying this medical data, Dr. Tarasenko claims to have been able to rule out the other possible causes of observed immune parameters which she had referred to in her report. (*Id.*)

The evidence before the court regarding the Tarasenko study is also somewhat confusing. Dr. Tarasenko's report, filed with this court on 3/15/95 as part of the Shevchenko report, does not indicate that she made any findings as to whether radiation exposure during the TMI accident produced the immune parameters which she observed. In fact, Dr. Tarasenko testified that it was not her purpose to interpret her findings. (Tr. at 588 ("[I]t was not my purpose to interpret these results. It was my purpose to obtain this data, to record these results.").) Moreover, her testimony confirms that at the point that she transmitted her findings to Professor Shevchenko, she did not have sufficient medical data to rule out other potential causes of the immunosuppression. (Tr. at 585.) Dr. Shevchenko, who has no experience or expertise in the area of immunology, read Dr. Tarasenko's report and reached the conclusion that the findings supported his hypothesis that residents of the TMI area were exposed to ionizing radiation during the TMI accident. (Tr. at 493; 2/21/95 Shevchenko Rpt. at 9.)

■ Plaintiffs argued during the *in limine* hearing that the dispute regarding the precise meaning of the Tarasenko study has arisen as a result of the court's ruling prohibiting Professor Shevchenko from testifying about the Tarasenko immune study. (Tr. at 491–95.)[26] Plaintiffs contend that Dr. Tarasenko was part of a team of experts working under Professor Shevchenko, and that she can only testify to the component of the research which she performed. The court does not disagree with Plaintiffs' assertion. However, the court takes exception to Plaintiffs' argument that they have been placed in this "Catch–22" by the court. The court took no part in assembling Plaintiffs' team of experts or in preparing the reports of those experts. Dr. Shevchenko does not have the expertise to testify as to the mechanics of the immune study; this is why the court required Dr. Tarasenko to testify. It should not have come as a shock to Plaintiffs' counsel that the court would not allow Professor Shevchenko to opine as to the methodology of a scientific procedure performed by another scientist and about which Professor Shevchenko has little or no technical knowledge. Additionally, it should have been apparent to Plaintiffs that where the proffered testimony asserts that an immune study reveals that the TMI Plaintiffs suffer from immunosuppression brought about by their exposure to ionizing radiation during the TMI accident, Defendants' would be entitled to cross-examine on the methodology of that immune study. Plaintiffs' counsel placed themselves in the situation they are in long before this court made any rulings on the issue.

---

**26.** Specifically, Plaintiffs' counsel argued as follows:

> Your Honor, that places the plaintiffs in a Catch 22. We have information in Professor Shevchenko's report that we're not allowed to use. We're supposed to bring the other witness here. We do that, and now we're not permitted to allow this witness to testify about it.

> If Professor Shevchenko could have testified about this in the first instance, we wouldn't be in this position. But based on that ruling, it's a can't-win situation for the plaintiffs the way the defendants are portraying it.
>
> (Tr. at 494.)

A different situation would exist if Dr. Tarasenko had issued a written report which reached the conclusion that the immune parameters observed in the TMI group resulted from exposure to ionizing radiation during the TMI accident. Were there such a report, the court would have no difficulty allowing Professor Shevchenko to testify that Dr. Tarasenko's study results corroborate his findings with respect to the tree study and cytogenetic analysis. No such report exists. Instead, Plaintiffs would have this court permit Professor Shevchenko to testify that after he filed his report with this court (which included the Tarasenko study), he had a discussion with Dr. Tarasenko at which time she confirmed that she had ruled out all other potential causative agents and determined that radiation was the cause of the immune parameters observed in the TMI samples.

The record somewhat contradicts the sequence of events advanced by Plaintiffs. Professor Shevchenko's written report, transmitted February 21, 1995, indicates that Dr. Tarasenko's study results support his findings with respect to radiation exposure. 2/21/95 Shevchenko Rpt. at 9. Dr. Tarasenko testified that "I had transmitted these results [of my analysis], and then I left Moscow." (Tr. at 588.) Dr. Tarasenko's report is dated February 15, 1995. She further testifies that she did not receive medical data until "after I transmitted this text for translation." (Tr. at 589.) Thus, it seems that prior to Dr. Tarasenko receiving medical data on the TMI subjects, prior to her evaluation of that data and use of that data to rule out other potential causative agents, and prior to Professor Shevchenko's phone conversation with Dr. Tarasenko on this subject, Professor Shevchenko had already reached his conclusion that radiation caused the observed immune parameters. The court is left to question how Professor Shevchenko read a report that makes no mention of radiation as a possible causative agent, and based upon that report, concluded that the report supports a finding that the TMI group suffers from some variety of radiation induced immunosuppression. Moreover, Dr. Tarasenko's testimony indicates that Professor Shevchenko made this assessment without inquiring as to any other factors that might have caused the immunosuppression in the TMI group. (Tr. at 587 ("And Dr. Shevchenko did not at any later date request me to identify any possible underlying factors that might have resulted in the changes that we have observed.").) The evidence before the court demonstrates that Professor Shevchenko concluded that radiation was the causative agent without having knowledge of other potential causative agents, and that he may have offered this opinion *before* Dr. Tarasenko had the opportunity to review medical information relating to the study subjects. Professor Shevchenko will be precluded from testifying as to his use of the immune study as corroboration of the results he obtained in the tree study and cytogenetic analysis.

■ In accordance with § I of this memorandum, the court will consider the testimony of Dr. Tarasenko presented during the *in limine* hearings despite the fact that much of her testimony went beyond the scope of her report. Defendants were permitted to cross-examine Dr. Tarasenko extensively on the testimony that the court will consider. On direct examination, Dr. Tarasenko testified to the inferences that she made based upon her study findings:

> The conclusion is this, characteristics that we have determined for inhabitants in the area of Three Mile Island, show almost ... the same as characteristics found for the inhabitants of Muslomovo village and Urals.
>
> . . . . .
>
> In other words, our conclusion is this, changes that we see in inhabitants of the Three Mile Island region are even deeper than those who lived in that village and who were eradiated [sic] as a consequence of the Kyshtym accident.
>
> . . . . .
>
> Our conclusion is that the immunodepression was found in both these groups under comparison. TMI group and Muslumovo group, immunodepression was present. The extent of immunodepression, however, was more prominent in the Three Mile Island accident.

(Tr. at 513, 520.) On cross-examination, Dr. Tarasenko was asked to explain the methodology which she employed in reaching these conclusions. The court will discuss that testimony in the context of its Rule 703 analysis.[27]

Rule 703 of the Federal Rule of Evidence provides that an expert may rely on any data that would reasonably be relied upon by other experts in the field. The Third Circuit has defined the district court's role in determining whether underlying data is of the type reasonably relied upon as follows:

> the judge must conduct an independent evaluation into reasonableness. The judge can of course take into account the particular expert's opinion that experts reasonably rely on that type of data, as well as the opinions of other experts as to its reliability, but the judge can also take into account other factors he or she deems relevant.

*Paoli II,* 35 F.3d at 748. In *Paoli II* the Third Circuit ruled on the district court's application of this rule in the context of a doctor's causation opinion linking exposure to PCBs with the plaintiffs' illnesses. The Third Circuit noted that "a physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted." *Id.* at 762. The court concluded "we think that generally, a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice—*but the doctor does need at least one of these sources.*" *Id.* (emphasis added). Upholding the district court's exclusion of testimony on the ground that the doctor had not based his opinion on

reliable data, the Third Circuit provided the following basis for its holding:

> Dr. DiGregorio did not examine the plaintiffs or review their medical records; he simply relied on their answers to a questionnaire he gave them. Under the rule we have articulated above, Dr. DiGregorio could not even reliably conclude that the plaintiffs had any illness. In fact, Dr. DiGregorio admitted that without examining the plaintiffs he could not state to a reasonable degree of medical certainty that they had been injured as a result of exposure to PCBs. We now uphold the district court's decision to exclude his testimony as within the court's discretion. Dr. DiGregorio simply lacked the foundation to make the judgments he did. For that reason alone, the district court was correct to grant summary judgment. . . .

*Id.* at 763.

Although not identical, the situation presented by the Tarasenko proffer is analogous.[28] On cross-examination when asked whether the study subjects' pre-existing medical conditions could have caused the observed immune response, Dr. Tarasenko indicated that "after I examined these parameters of the immune system for the subject, I found that yes, indeed, some of their diseases could be responsible for some of the changes observed." (Tr. at 592.) Dr. Tarasenko's report echoes this concern:

> Such disturbances are observed in the patients who use immunodepressants (widely used antibiotics, aspirin and other medicines can be referred to this group of chemicals) and suffer from cancer, autoimmune diseases, syndrom [sic] of chronic weariness and others. *It is undoubtedly necessary to carry out a dynamic examination of all persons in this group, regular observation of their immune status, medical and prophylactic measures.*

27. The court will discuss Rule 703 prior to reaching the *Daubert/Paoli II* factors because the court finds the Rule 703 issue to be dispositive.

28. Where Dr. DiGregorio was a physician offering a causation opinion drawn from his evaluation of self-reported symptoms, Dr. Tarasenko is a physician and immunologist offering a causation opinion based in part upon her reliance on

self-reported medical histories. While the court finds the actual immune analysis conducted by Dr. Tarasenko to be scientifically valid and reliable, the court finds below that the inferences drawn from that study are not based upon "good grounds" because Dr. Tarasenko based her causal inferences upon her interpretation of unreliable medical data.

2/15/95 Tarasenko Rpt. at 2 (emphasis added). During the *in limine* hearing, Dr. Tarasenko stated for the first time that she had made an attempt to rule out other causes of the observed immune responses. Dr. Tarasenko also stated that in ruling out other causes she relied solely upon the medical information provided to her by Dr. Snigiryova. (Tr. at 596.) According to Dr. Tarasenko, the medical summaries she received for each study subject included information regarding the "presence or absence of autoimmune diseases ... [the] presence or absence of oncological cancer diseases, whether [the subject] ... is a smoker or nonsmoker ... [and] the extent of smoking, then patient's age, then a list of major diseases." (Tr. at 589–90.) Dr. Tarasenko did not review the medical records of nor personally examine her study subjects.

Presuming that Dr. Tarasenko did use the medical summaries provided by Dr. Snigiryova to rule out other potential causes for the immune responses, the court remains unconvinced that this data was reliable. The medical summaries are just that—summary medical history data. Although the summaries indicate that the subjects have been diagnosed as having certain major medical ailments, they provide no information as to a variety of less severe illnesses and treatments that could be responsible for the observed immune response (e.g. whether they take aspirin on a regular basis or whether they suffer from chronic stress or anxiety). Further, the court is troubled by Dr. Tarasenko's recent change of heart as to what steps should be taken before reaching a conclusion regarding the cause of the observed immune response. Her report indicates that she found it "necessary" to carry out a "dynamic" examination of all study subjects and to make a longer term observation of their immune responses. 2/15/95 Tarasenko Rpt. at 2. Yet at the *in limine* hearing, Dr. Tarasenko suddenly revealed that she could state "with a reasonable degree of medical certainty" that the immune responses were caused by exposure to large amounts of ionizing radiation based solely upon her observation of cursory medical summaries. (Tr. at 512–13.) No explanation was given for this somewhat radical change in philosophy.

Based upon the record before it, the court will exclude the proffered immune study testimony of Dr. Tarasenko. The court finds that Dr. Tarasenko "lacked the foundation to make the judgments [s]he did." As such, her conclusions are not based upon "good grounds" and are not scientifically reliable. In accordance with this ruling, the court will likewise preclude Dr. Shevchenko from testifying that he relied upon the Tarasenko report to corroborate the findings of his tree study or cytogenetic analysis.

### B. *Dr. Bruce Molholt*

■ Dr. Molholt's initial report filed with the court is dated April 8, 1993. In this report, Dr. Molholt opines that "the pattern of depressed lymphocyte production ... may be used as a long-lived form of human dosimetry to back-calculate the intensity of population exposures during radiation exposures such as occurred during the TMI accident." 4/8/93 Molholt Rpt. at 1–2. Using this back-calculation methodology, Dr. Molholt reaches the conclusion that "[t]aken as a whole, the immunologic evidence supports the conclusion that human radiation exposures exceeded 100 rems as a result of the TMI accident." This report became the subject of Defendants' first motion *in limine.*

After briefing was complete, but before the court ruled on the motion, Plaintiffs submitted the 3/13/95 report of Dr. Molholt. According to Dr. Molholt, the purpose of this report "is to examine the medical histories of each of the remaining 11 test plaintiff cases and determine, with reasonable scientific certainty, whether or not the cancers they each developed following ... [the TMI accident] are more likely than not due to radiation exposures received as a result of the accident." 3/13/95 Molholt Rpt. at 3. An important part of Dr. Molholt's methodology in this report involved his use of "lymphocyte profiles" for the test Plaintiffs as a means of determining whether their neoplasms were induced by exposure to radiation. The court will provide a more thorough discussion of this methodology below.

On February 14, 1995, the court issued a preliminary ruling on Defendants' motion *in*

*limine* to exclude Dr. Molholt's 4/8/93 report. The court found that the parties' briefs, read in conjunction with the record evidence, failed to provide sufficient information for the court to conduct an adequate *Daubert/Paoli II* analysis. *In re TMI*, Mem.Op. at 22 (M.D.Pa. February 14, 1995). The court took particular care within the body of its opinion to identify the areas where the court was having difficulty conducting its analysis and to describe the type of filing (e.g. briefing, references to scientific literature, submission of additional evidence) that would be most beneficial to the court in making the *Daubert/Paoli II* analysis.[29] On May 1, 1995, proportedly in response to the court's February 14 order, Plaintiffs filed a third Molholt report. This report elaborates upon the March 13 report by, *inter alia*, providing supplemental lymphocyte and cancer incidence data.

During the first round of *in limine* hearings, Plaintiffs advised the court that they would withdraw a portion of the Molholt proffer. (11/17/95 Tr. at 681 ("The subject of the defendants' briefing on and attack on Dr. Molholt was his use of lymphocyte counts to back[-]calculate dose.... We were willing to have the motion granted in the limited aspect of the attack, which is the lymphocyte count, and not proffer Dr. Molholt to opine on that methodology.").) Plaintiffs further indicated that Dr. Molholt "would still be tendered consistent with the other aspects of his reports." (11/17/95 Tr. at 682.) Controversy has arisen as to what, if any, testimony Dr. Molholt can provide consistent with his other reports in light of the fact that the lymphocyte methodology has been withdrawn.

During the second round of hearings, the court held a lengthy conference with counsel in chambers on this issue followed by an additional colloquy with Plaintiffs' counsel once court resumed. Plaintiffs argue that they withdrew only the methodology and conclusions associated with the use of lymphocytes to back-calculate dose. (Tr. at 650–51.) As such, Plaintiffs contend that the Molholt "corollary hypotheses" are still viable. When asked by the court during the in chambers conference to "[t]ell me now on the record" the exact purpose for which the lymphocyte testimony was withdrawn, Plaintiffs' counsel indicated that "our understanding was that it was withdrawn for the sole purpose of the attack made by the defendants that you could not back-calculate dose based upon lymphocyte counts." (Tr. at 658.) Defendants argue that the reports characterize the corollary hypotheses as "evidence for clinical lymphocyte depression and immunosuppression," and that this was precisely the line of testimony that they believed Plaintiffs withdrew. (Tr. at 648.)

Plaintiffs have placed two inconsistent arguments on the record with respect to the lymphocyte back-calculations and Dr. Molholt's May 1 report. The first sentence on the cover page of the May 1 report states that "[e]nclosed you will please find my response to the Court's memorandum of 14 February 1995 relating to Defendant's [sic] motion to exclude my testimony *in limine* in the ongoing TMI litigation." 5/1/95 Molholt Rpt. at 1. The only methodology at issue in the court's February 14 ruling was the lymphocyte back-calculation methodology. Accordingly, in the words of the report's author, the May 1 report was intended to respond to the court's 2/14/95 request for information supporting the lymphocyte back-calculation methodology. Since withdrawing the lymphocyte hypothesis, Plaintiffs have argued that the corollary hypothe-

**29.** In its February 14 preliminary ruling on the *in limine* motion to exclude the 4/8/93 Molholt report, the court requested the following information: (1) evidence demonstrating that the lymphocyte back-calculation methodology is based upon a testable hypothesis or concise briefing of the issue; (2) evidence that Dr. Molholt's back-calculation methodology has been or is being subject to peer review; (3) briefing on the issue of whether the "reasonable expert" would rely solely upon flawed data in conducting a study; (4) provision by Plaintiffs of a concise response

as to whether there were standards controlling the operation of Dr. Molholt's technique; (5) briefing on the issue of whether the back-calculation methodology is generally accepted; (6) a response to the question of whether Dr. Molholt's methodology bears any relationship to established and reliable methods; (7) evidence in support of the proposition that Dr. Molholt is qualified to testify in the areas of immunology and immunobiology; (8) evidence demonstrating that the Molholt methodology has any non-judicial use.

ses set forth in the May 1 report stand as an independent methodology from which Dr. Molholt can infer exposure.[30] To the contrary, the Molholt report itself characterizes the corollary hypotheses as "relevant scientific data in support of the first [ (Lymphocyte back-calculation) ] hypothesis." 5/1/95 Molholt Rpt. at 3–4.[31]

The following observations can be made. Relying on the plain language of the May 1 report, the court finds that the report was filed in response to the court's request for further briefing on the lymphocyte back-calculation methodology. This methodology has been withdrawn by Plaintiffs. Such a withdrawal necessarily includes a withdrawal of reports submitted in support of this methodology. Relying, however, on Plaintiffs' most recent corollary hypothesis arguments, the court reaches a different yet troubling conclusion. To credit Plaintiffs' argument that the corollary hypotheses stated in the May 1 report represent an independent methodology through which Dr. Molholt can opine about exposure and causation, the court must first: 1) ignore the express language of the May 1 report and thus, the intention of its author, and 2) accept Plaintiffs' submission of a new expert report, filed without leave of court, subsequent to the filing deadlines, as an exhibit to an unrelated brief.

The court is neither comfortable with nor inclined to ignore the plain language of Dr. Molholt's report. Consequently, the court finds that the May 1 report was submitted in response to this court's request for further briefing on the lymphocyte back-calculation methodology. Plaintiffs have since withdrawn that methodology. As such, the May 1 report is no longer relevant to this case. Based upon the foregoing, the court will exclude the May 1 report of Dr. Molholt. Remaining for the court's consideration is Dr. Molholt's March 13, 1995 report.

### 1. The Proffered Testimony

■ According to the introduction to the March 13 report, the "report focuses on three aspects of the histories of each test plaintiff" rather than upon "mechanisms of radiation carcinogenesis." 3/13/95 Molholt Rpt. at 3. These three "aspects" are as follows:

1. Were test plaintiffs exposed to sufficient ionizing radiation in 1979 to experience lymphocyte depression and/or immunosuppression? Blood analyses and decline in health status are indicators.

2. Were there other indications by Plaintiffs of acute radiation exposure at the time of the TMI–2 accident, such as erythema, nausea, iodine taste, etc.?

3. Were the test plaintiffs in areas of known radiation exposure at the time of the TMI–2 accident, i.e., downwind

---

30. At the hearings, the court engaged in a rather lengthy colloquy with Plaintiffs' counsel on this issue. (Tr. at 669.) Plaintiffs' counsel argued that the withdrawal of Dr. Molholt's lymphocyte methodology was a "tactical decision," and that they "are not conceding anything wrong with the methodology." (Tr. at 666.) Counsel further stated that Plaintiffs "were withdrawing the offer of this expert on that basis for calculating dose." (*Id.*) Plaintiffs are clearly entitled to make such a tactical decision. They are not, however, entitled to bring a dose opinion in through the back door. The court repeatedly asked Plaintiffs' counsel to explain how Dr. Molholt could claim that decreased lymphocyte counts resulted from irradiation without testifying that a certain dose is medically necessary to decrease the lymphocytes in the first place. (*Id.* at 667–69.) The court's questions elicited the following responses: "Well, I'm not sure that he's saying—I mean, he is attributing all these elements as a whole that if you have all of these elements that—" (*id.* at 668); "I don't know that—I guess there has to be

some dosage. Without some dosage, you would have—I'd have to agree with that. If it comes from the radiation, then there would have to be some dose of radiation to report." (*Id.* at 668–69.) Plaintiffs cannot have it both ways. Withdrawing Dr. Molholt's methodology whereby he uses lymphocyte data to back-calculate dose means that Dr. Molholt cannot use depressed lymphocyte counts as a basis for inferring any dose to the TMI population.

31. As an aside, the court notes that Dr. Molholt himself appears to believe that "Lymphocyte depression and immunosuppression as biomonitors of radiation exposure have been withdrawn from my testimony with respect to the *in limine* hearings...." (Pls.' Answer and Mem. of Law in Op. to Defs.' Motn. in Limine to Exclude the Testimony of Pls.' Experts on Medical Causation at Ex. B (1/31/96 Molholt Aff.).) The court has admitted this affidavit for the sole purpose of making this observation. It is excluded for all other purposes pursuant to § I of this memorandum of law.

or in areas which have borne subsequent evidence of radiation exposure such as arboreal apical ablation?

*Id.* Based upon an evaluation of these factors, Dr. Molholt opines "with reasonable medical certainty" that "radionuclide releases from the TMI accident were causally related to the subsequently observed statistically significant increases in birth defects and cancers among exposed populations." *Id.* at 7. Additionally, Dr. Molholt states that it is the "thesis" of his report that "radiation doses were [greater than or equal to] 100 rems to the majority of test plaintiffs." Insofar as Dr. Molholt uses lymphocyte data to back-calculate dose, the methodology has been withdrawn by Plaintiffs and will not be considered by the court.[32] The court will now evaluate the balance of the March 13 report.

## 2. The *Daubert/Paoli II* Analysis

### a. Is the Methodology Based Upon a Testable Hypothesis?

Dr. Molholt's hypothesis, that the majority of test Plaintiffs were exposed to greater than or equal to 100 rems of radiation and that increases in cancer and birth defects are causally related to radiation exposure from the TMI accident, is testable. This is not in dispute. The issue is whether Dr. Molholt tested his hypothesis. According to Dr. Molholt's report, he "attempted to apply four weighted scores to six relevant causal criteria." 3/13/95 Molholt Rpt. at 17. The record is not clear as to how Dr. Molholt scored each category. In his report, Dr. Molholt states that "[t]hese six contributors to causal certainty *are not equally weighted.*" *Id.* (emphasis added). While testifying at the hearings, Dr. Molholt stated that he "at-

tempted to weigh these six criteria *equally.*" (Tr. at 841 (emphasis added).) When asked about this seeming contradiction Dr. Molholt testified as follows:

although my objective was to weigh each of these equally, that is, to give them one-sixth of the total—actually 16.6 percent of the total score, in fact, when there was an outstanding criterion like dicentric chromosome formation, that tended to overwhelm the other five criteria, such that if I had been in a position of making the 50 percent reasonable scientific certainty standard employed or not, in other words, if I was at that boundary, I would have weighed the chromosomal criteria more than damaged trees or more than lymphocyte depression or more than lag time.

(Tr. at 842.) Defense counsel followed up by asking "if you got a positive answer on chromosome abnormalities, that carried the day?" (*Id.*) Dr. Molholt provided the following clarification:

If I were at that boundary between certainty and uncertainty, which is the 50 percent standard that has been employed, at least up until Daubert and Paoli [II] ... what I was attempting to do was to quantify these criteria in such a way that I could, on an individual basis of each one of these, make a 50 percent determination, but then collectively to say, on that system of three, two, one, you have six criteria, the highest score is 18 if all six criteria are satisfied in terms of what we know about exposure requirements and carcinogenesis, radiation carcinogenesis.

So if those six criteria were all satisfied to the fullest, you would have a score of 18.

---

**32.** As the preceding discussion indicates, Plaintiffs "were willing to have the motion [*in limine*] granted in the limited aspect of the attack, which is the lymphocyte count." (11/17/95 Tr. at 681.) Plaintiffs further indicated that Dr. Molholt "would still be proffered consistent with the other aspects of his report." (*Id.*) Contrary to Plaintiffs belief, they cannot withdraw the lymphocyte methodology as a "primary hypothesis" and yet rely upon the same methodology as a component of a broader analysis. If a methodology is withdrawn it is withdrawn as to all applications. The court can make no distinction between the way that Dr. Molholt used the lymphocyte data in his April 8, 1993 report and the

way he uses the data in the present report, save that in the present report Dr. Molholt uses the lymphocyte data in conjunction with other data (nevertheless, the lymphocyte data is still used to infer a dose of greater than or equal to 100 rem). As such, the court finds it inconsistent to withdraw the methodology as it appeared in the April 8 report, and yet admit the same methodology as it appears in the March 13 report. Consequently, the court will exclude the portion of Dr. Molholt's March 13 report that includes use of lymphocyte data to infer dose as the methodology is identical to back-calculation methodology withdrawn by Plaintiffs.

That's the highest you could get. The lowest you could get is if none of them were satisfied at all, and that's zero. So I took nine as being the boundary.

(Tr. at 842–43.) When asked "if they hit nine, then you said that's enough?" (Tr. at 843) Dr. Molholt responded:

No, I didn't. That's when I would reach into my basket of tricks and pull out dicentric chromosomes or some other characteristic that I thought deserved more credence than trying to equally weigh them.

Now, as it turned out … I didn't have any that were nine.

(*Id.*) Based upon the foregoing, the court finds that Dr. Molholt did not test his hypothesis. His method of deriving weighted scores for his six factors is entirely subjective, and as such, it cannot be characterized as a scientific means of testing his hypothesis. This factor will weigh against the admission of the proffered testimony.

### b. Has the Methodology Been Subject to Peer Review?

With respect to Dr. Molholt's causation and exposure opinion, Plaintiffs make no direct argument in support of this factor. Plaintiffs' legal argument focuses on its characterization of Dr. Molholt's methodology as a differential diagnosis. The court surmises that Plaintiffs would argue that the case law supports a finding that there is no way to "peer review" a differential diagnosis because such diagnoses are made by physicians on the basis of their own experience. Insofar as Dr. Molholt claims to have made a differential diagnosis, this argument would be accurate. The court notes, however, that in their brief in opposition to Defendants' motion *in limine* Plaintiffs state that "Dr. Molholt's techniques are simply extensions of the principles utilizes as a toxicologist and risk assessor applied to the unique circumstances of this case." (Pls.' Brief in Op. to Defs.' Motn. *In Limine* to Exclude Pls.' Medical Causation Experts at 51.) In that same brief, Plaintiffs also argue as follows:

Dr. Molholt …. is not analyzing the information presented in his report as a medical doctor, a radiation biologist, a physicist, a nuclear engineer or a meteorologist. He is a toxicologist and carried out his analysis consistently with well-accepted principles of toxicology.

⋅ ⋅ ⋅ ⋅ ⋅

Defendants' arguments that Dr. Molholt merely examined a checklist of factors and did not engage in a differential diagnosis akin to a medical doctor's examination, is wholly without merit. Dr. Molholt applied his expertise [in risk assessment] to assessing the toxicological significance of various cardinal signs of high radiation doses.

(*Id.* at 114 & 117.) Plaintiffs appear to argue that Dr. Molholt has performed both a differential diagnosis and a risk assessment. This characterization serves them well as they argue for application of the more liberal standard of admissibility germane to differential diagnoses, while at the same time arguing that Dr. Molholt has used his expertise as a risk assessor to determine the "toxicological significance" of his findings. The evidence before the court indicates that a toxicological risk assessment is a scientific methodology akin but not identical to a differential diagnosis. This distinction will be discussed at greater length below. The court finds that based upon the record evidence, Dr. Molholt's study is best characterized as a toxicological risk assessment. As such, the peer review factor is relevant. There is no record evidence demonstrating that the particular methodology of weighting scores for different criteria has been peer reviewed. Accordingly, this factor will weigh against the admission of the proffered testimony.

### c. Is There a Known or Potential Rate of Error?

The court has already found Dr. Molholt's weighting scheme to be highly subjective and therefore unscientific. As such, the court finds the potential rate of error of Dr. Molholt's methodology to be high. This factor weighs against the admission of the proffered testimony.

### d. Were There Standards Controlling the Technique's Operation?

The court finds that this factor is not directly relevant to Dr. Molholt's study insofar as he did not perform any laboratory techniques that would necessitate the imposi-

tion of certain standards. To the extent that Dr. Molholt's methodology was subjective rather than objective, an important scientific standard was effectively absent from the technique. Nevertheless, because the court finds this standard not to be directly relevant, it will weigh neither in favor nor against the admission of the proffered testimony.

*e. Is the Methodology Generally Accepted?*

Plaintiffs argue that "[r]egarding general acceptance, Dr. Molholt relies upon a wide range of evidence that toxicologists customarily rely upon in analyzing the effects of exposure. That is demonstrated here by the numerous citations to the *Reference Manual*." (Pls.' Findings at 116.) The Reference Manual on Scientific Evidence provides the following discussion regarding toxicologic testimony supporting the finding of a causal relationship between an individual's exposure and the onset of disease:

> An expert who opines that exposure to a compound caused a person's disease engages in deductive clinical reasoning. In most instances, cancers and other diseases do not wear labels documenting their causation. The opinion is based on an assessment of the individual's exposure, including the amount, the temporal relationship between the exposure and disease, and exposure to other disease-causing factors. This information is then compared to research data on the relationship between exposure and disease. *The certainty of the expert's opinion depends upon the strength of the research data demonstrating a relationship between exposure and the disease at the dose in question and the absence of other disease causing factors.*

Ref.Man. at 205 (emphasis added). The court finds Dr. Molholt's methodology to differ from the generally accepted methodology defined in the Reference Manual. Dr. Molholt's assessment of exposure in his report was based upon his lymphocyte back-calculation methodology and other "[a]ncillary evidence." 3/13/95 Molholt Rpt. at 6. In the report Dr. Molholt notes that:

> Ancillary evidence for radionuclide exposures during this period include:

> Frequenting an area known to be downwind during radionuclide releases, especially during the period 28–30 March 1979. In many cases proximity to TMI is important in that plumes tend to disperse with distance. However, in the first few days of the accident, it appears that plumes may have traveled for miles in virtually every direction with little dispersion (Vergeiner, 1995).

> Indications of radiation exposure at the time of the accident including erythema, metallic taste, eye or mucous membrane irritation and nausea either by test plaintiffs or members of their immediate family.

> Local indications of radiation exposure as preserved in the botanical record. In particular, as detailed by plaintiffs' experts Drs. Gunckel and Shevchenko, trees provided sensitive and long-lasting monitors of acute radionuclide releases in areas surrounding Three Mile Island during the 1979 reactor accident (Shevchenko, 1994; Gunckel, 1994).

3/13/95 Molholt Rpt. at 6–7. Based upon his evaluation of lymphocyte data and the ancillary evidence, Dr. Molholt concludes that "[a]s a direct consequence of the accident, individual off-site exposures exceeded 100 rems for many persons, which conclusion also exceeds official estimates of dose by over three orders of magnitude." *Id.* at 7.

The Reference Manual notes that "[e]vidence of exposure is essential in determining the effects of harmful substances." Ref.Man. at 206. Three approaches are defined for measuring potential exposure: 1) "where direct measurements cannot be made, exposure can be measured by mathematical modeling"; 2) "using direct measurements of the medium in question"; and 3) "directly measur[ing] human receptors through some form of *biological monitoring*." *Id.* "Ideally, both environmental testing and biological monitoring are performed; however, this is not always possible." *Id.*

The court finds that the methodology used by Dr. Molholt to render a causal opinion in this case is not generally accepted. The accepted toxicological methodology would first ascertain exposure and dose, and then

utilize deductive clinical reasoning to make the causal link between exposure and subsequent illness. Dr. Molholt has blurred the distinction between these steps. He uses substantially the same information [33] to back-calculate dose that he uses to support his finding of a causal link. Moreover, Dr. Molholt makes specific findings that the test plaintiffs' neoplasms are causally related to exposure during the TMI accident without quantifying a dose for any of the Plaintiffs. Because the evidence presented in support of Dr. Molholt's report fails to demonstrate that his report is based upon reliable evidence of exposure, the court finds that Dr. Molholt's methodology is not generally accepted.

### f. Is There a Relationship Between the Technique and Methods that are Established to Be Reliable?

The court finds that Dr. Molholt's technique bears little relationship to the established and reliable methods for assessing whether a causal link exists between exposure to a toxic substance and the subsequent onset of illness. During the *in limine* hearing, Dr. Molholt testified as to how a risk assessment typically proceeds. First, one defines the source term. (Tr. at 932–33.) Next, one examines the pathways of releases, quantifies the releases, and examines the transport mechanisms by which those releases reach the individual in question. (Tr. at 933–34.) One then calculates the dose at the point of interest, given the individual's type of cancer. (Tr. at 934.) Finally, one refers to epidemiological data if there is any, and there is a "plethora" of such data for the carcinogenic effect of radiation, to quantify the probability that the individual's cancer was caused by the calculated organ dose received. (Tr. at 934–35.) The record does

not support the assertion that Dr. Molholt followed this methodology in the context of the 3/13/95 report. A source term was not defined,[34] and there was no calculation of dose at the point of interest (organ dose). Dr. Molholt's technique bears little resemblance to his own articulation of established and reliable methods.

Based upon the foregoing, the court finds that this factor weighs against the admission of the proffered testimony.

### g. What are the Qualifications of the Expert Based Upon the Methodology?

Defendants argue that while Dr. Molholt "may be qualified to perform risk assessments in fields other than radiation, he does not appear to be qualified to address the specific toxin involved in these cases." (Defs.' Findings at 62.) The court cannot agree with Defendants. Pursuant to *Paoli II* the court must apply this factor liberally. The court finds Dr. Molholt to be qualified to perform a toxicological risk assessment. As such, the court finds him qualified to testify based upon the methodology at issue. This factor will weigh in favor of the proffered testimony.

### h. Does the Methodology Have Non–Judicial Uses?

Plaintiffs argue that the non-judicial applications of Dr. Molholt's methodology "include risk assessment at hundreds of superfund cites [sic], risk assessment with respect to workplace exposures to substances, and more." (Pls.' Findings at 117.) The court agrees with Plaintiffs that, as a general matter, toxicological risk assessments have far reaching non-judicial uses. The issue, however, is whether the methodology employed

**33.** The court notes that the plume dispersion data relied upon by Dr. Molholt has been found by this court to be scientifically unreliable; the evidence of acute radiation exposure (erythema, metallic taste, nausea, etc.) is based not upon medical records but upon responses to questionnaires circulated by Plaintiffs' consultants following the accident; and, the lymphocyte back-calculation methodology has been withdrawn by Plaintiffs.

**34.** To the extent that Dr. Molholt may have relied on Dr. Webb's source term, that calculation as been disavowed by Dr. Webb himself. The only

references to dose literature that the court finds within the report are listed in Dr. Molholt's table of references. They are "Takeshi, S. (1979) NRC's gross underestimation of the radioactive releases and population doses during the TMI–2 accident. Nucl Eng, vol. 26, no. 3" and "Shevchenko, V.A. (1994) Concerning the dose to any individual from the TMI Unit 2 accident. Affidavit submitted 6 July 1994 (15 pp.)." The court notes that it has found Professor Shevchenko's quantified dose estimates to be scientifically unreliable.

by Dr. Molholt in his March 13 report has any non-judicial use.[35] There is no evidence before the court to indicate that it does. Accordingly, this factor weighs against the admission of the proffered testimony.

### 3. Conclusion

The court's *Daubert/Paoli II* analysis weighs heavily in favor of excluding the proffered testimony as scientifically unreliable. In addition to the factors discussed above, the court finds additional support for finding Dr. Molholt's methodology scientifically unreliable in his inability to consistently articulate the same methodology. The court recognizes that on one level contradictions in Dr. Molholt's report and subsequent deposition and hearing testimony are issues of credibility that are not presently before the court. On a second level, however, the court finds these contradictions to be directly relevant to the reliability of the proffered testimony. If an expert's answer to a question regarding his methodology changes each time he is posed with that same question, it follows that the methodology is unreliable insofar as the expert himself is unable to state with certainty what steps or factors comprise his methodology.

The court finds the following examples to be illustrative of its point. At the hearing Dr. Molholt testified that the reason he only presented plots of lymphocyte counts for five of the eight test Plaintiffs was that he found the five cases to be "illustrative." (Tr. at 1246.) At his deposition, Dr. Molholt testified that "the honest answer is when I first started plotting these data that's all the room I had on my graph paper." 6/1/95 Molholt Dep. at 174. Dr. Molholt testified that at the time he issued his 3/13/95 report, he had not done specific organ dose calculations. (Tr. at 778.) Yet he also testified that "[m]y assessment was that 99 percent of the organ specific dose came from uptake of the radionuclides rather than from cloud shine or an external source." (Tr. at 781) This raises the obvious question of how a methodology

that did not include calculation of a specific organ dose could allow one to assess that 99 percent of the organ dose came from the uptake of radionuclides? At his deposition, Dr. Molholt testified that to determine whether a test plaintiff was in the pathway of the plume during the accident "I used Ignaz Vergeiner's vectors and meteorological dispersion models." 6/1/95 Molholt Dep. at 27. At the hearing, Dr. Molholt testified that "I believe that when I did the initial analysis ... my initial data came from Jan Beyea.... In the middle of the analysis ... I saw for the first time Vergeiner's approach to describing plume distribution. I then attempted to apply his data.... I did defer to Vergeiner's data when there was an inconsistency between the two...." (Tr. at 943–44.) At his January 1995 deposition, Dr. Molholt testified that nausea, as an acute effect of radiation, was associated with a dose of 300 rems. (1/26/95 Molholt Dep. at 255.) During his June 1995 deposition, Dr. Molholt testified that nausea was associated with a dose of 50 to 100 rems. (6/1/95 Molholt Dep. at 39–40.) At the hearings, Dr. Molholt testified that nausea was associated with a dose of 150 rems. (Tr. at 845.) Finally, during his June 1995 deposition, Dr. Molholt testified that he did not consider or make an adjustment as to whether a test plaintiff's cancer was unusual for someone of their age. (6/1/95 Molholt Dep. at 67.) At the hearings, Dr. Molholt testified that he made this consideration in conjunction with his "age at diagnosis" factor. (Tr. at 854.)

Based upon the foregoing, the court finds the proffered testimony of Dr. Molholt to be scientifically unreliable and therefore inadmissible. As an additional basis for exclusion, the court finds that Dr. Molholt failed to rely upon the type of data that the reasonable expert in the field, performing a toxicological risk assessment on the test Plaintiffs, would have relied upon. Fed.R.Evid. 703; *see supra* at 84–85.

---

**35.** Dr. Molholt himself distinguished the risk assessment he performed for this case from a traditional risk assessment:

In that we have a different set of parameters that are available for test plaintiffs than those

accorded in a traditional risk assessment, the approach had to be modified in order to use the data at hand.
(Tr. at 935–36.)

### C. *Dr. Luis F. Fajardo*

■ Dr. Fajardo is a well respected physician who is board certified in pathology. He is presently a Professor of Pathology at the Stanford University School of Medicine, and has research and teaching experience in the area of radiation injury. On July 29, 1994, Plaintiffs filed Dr. Fajardo's one-page report. In that report, Dr. Fajardo indicates that he has reviewed the "clinical records and other documents" of eight current and one former test Plaintiff.[36] Based upon his review of the records, Dr. Fajardo concluded that Plaintiffs did exhibit the stated neoplasms and that such neoplasms "can be induced by ionizing radiation." 7/29/94 Fajardo Rpt. Dr. Fajardo also reached the following conditional finding:

> Provided that a significant release of radionuclides did occur in the accident (resulting in acute exposures equal to, or greater than, 10 cGy per person), and that an increase in the incidence of cancers in the presumably affected population can be demonstrated after the accident, it is more likely than not that in the above cases, the stated neoplasms were causally related to radiation from the Three Mile Island accident.

7/29/94 Fajardo Rpt. The report contained neither a statement of his methodology nor reference to materials he relied upon beyond the test Plaintiffs' clinical records. On its face, this filing is in violation of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

On January 30, 1996, eleven months after the expert report filing deadline and without leave of court, Plaintiffs filed the "supplemental affidavit" of Dr. Fajardo.[37] In its January 5 ruling, this court explained the rationale for its November 9, 1995 order excluding certain of Plaintiffs' other untimely filed reports during the first round of hearings. "[F]or the purposes of this litigation, the discrete body of factual evidence with respect to the issue of dose [and medical causation] became fixed on March 1.... *attempts to build on this body of facts after the filing deadline passed were misplaced.*" In re TMI, 911 F.Supp. at 829. Thus, with respect to Dr. Fajardo's reports, Plaintiffs violated Rule 26 with the filing of the initial report, and violated at least three separate orders of this court with the filing of the supplemental affidavit (11/3/94 Scheduling Order; 11/9/95 order; 1/5/96 order). To date Plaintiffs have offered no explanation or justification on the record for the late filing of the supplemental Fajardo affidavit.[38] Pursuant to the court's discussion in § I of this memorandum of law, the court will exclude Dr. Fajardo's January 30 supplemental affidavit. As such, the court will sustain Defendants' continuing objection to that portion of Dr. Fajardo's *in limine* testimony which goes beyond the scope of his timely filed report and deposition testimony.[39]

36. Plaintiff Cecilia Macri, whose records Dr. Fajardo examined, has been stricken as a test Plaintiff.

37. Dr. Fajardo characterizes his supplemental affidavit as "an explanation of my opinion rendered on July 29, 1994." 1/30/96 Fajardo Rpt. at 1. At the outset, the court will note that parts of the supplemental affidavit read more like a piece of persuasive legal writing than a medical report. *See, e.g.,* 1/30/96 Fajardo Aff. at 1 ("My conclusion that these persons developed these neoplasms is based on my examination of clinical records, and pathology reports in particular. *As far as I know this aspect of the litigation is unquestionable.*") (emphasis added); *id.* at 2 ("I am aware that Drs. Gunckel and Crawford–Brown are being prevented from testifying and that the plaintiffs have asked the Court to reconsider this decision. The Court's determination does not undermine the foundation for my opinion that exposures did exceed 10 rem."); *id.* ("In contrast to the above, the defendants claim

that the exposures were in the order of millirems.... The discrepancy between the exposures claimed by the plaintiffs and those admitted by the defendants can be explained by the location of the dosimeters (TLD) on which the defendants base their data. There were several gaps in the placement of the TLD, most prominently between approximately 2.7 miles and 9 miles from the TMI reactor.").

38. Surprisingly, Plaintiffs make no mention of the timeliness issue in their findings of fact and conclusions of law. This is notable insofar as the majority of Dr. Fajardo's hearing testimony was subject to Defendants' continuing objection as to the untimely filed supplemental affidavit.

39. The court will admit deposition testimony that goes beyond the scope of the timely filed report as Dr. Fajardo's deposition was taken in June of 1995. Defendants have had ample opportunity to review the deposition testimony and were per-

Due to the brevity of Dr. Fajardo's timely filed report, the court's *Daubert/Paoli II* analysis will necessarily be brief.

### 1. Is the Methodology Based Upon a Testable Hypothesis?

Based upon his timely filed report, the court finds that Dr. Fajardo's hypothesis is that presuming exposure to radiation greater than or equal to 10cGy during the TMI accident, the test Plaintiffs' neoplasms were induced by the radiation exposure. Insofar as the etiology of each test Plaintiffs' neoplasm can be identified with any degree of certainty, Dr. Fajardo's methodology is testable. With respect to the etiology of radiation-induced cancers, the Bier V report notes that a description of the risk of cancer from exposure to ionizing radiation "is bound to be inexact since the etiology of radiation-induced cancer is complex and incompletely understood." National Research Council, Bier V Rpt. 161 (1990). Despite the limitations based upon incomplete scientific knowledge that do exist, the court finds that Dr. Fajardo's hypothesis can be tested by ruling out other potential etiologies.[40] Dr. Fajardos' timely filed report does not offer any discussion of whether Dr. Fajardo made any attempt to rule out other potential etiologies. Dr. Fajardo's deposition testimony supports the contention that he made some attempts to rule out other causes. (*See, e.g.,* 6/7/95 Fajardo Dep. at 42 (indicating that he confirmed each test Plaintiffs' cancer diagnosis and "determined that there wasn't anything [in their medical histories] that would cloud the possibility" of the neoplasms being radiation-induced); *id.* at 43 (indicating that he "was satisfied that in these cases ... there were no pre-existing conditions that would indicate that these individuals had acquired such cancers prior to the exposure to radiation"); *id.* at 45–49 (explaining conditions he evaluated and literature he relied upon to determine whether the neoplasms were radiation-induced).)

The court finds that Dr. Fajardo made some attempt to test his hypothesis. To the extent that Defendants argue that Dr. Fajardo's testing of the hypothesis could have been more rigorous, such an argument goes more to weight than admissibility. This factor will weigh in favor of the admission of the proffered testimony.

### 2. Has the Methodology Been Subject to Peer Review?

The court can find nothing in Dr. Fajardo's report, deposition testimony or hearing testimony to suggest that the methodology he employed to determine the etiology of the test Plaintiffs' neoplasms has been subject to peer review. In their findings of fact, Plaintiffs note that "Dr. Fajardo has been accepted in previous litigation as an expert witness on the question of whether radiation exposure caused radiation injury. In those instances, he used the same methodology for determining causation as he used for determining causation in the instant litigation." (Pls.' Findings at 108.) During Dr. Fajardo's June 7, 1995 deposition Defendants' sought information as to the specifics of other cases in which Dr. Fajardo has been involved. (Fajardo Dep. at 8 ("I would ask that [Plaintiffs' counsel] ... provide us with a list of the names of the cases in which he's provided testimony.").[41]

On cross-examination at the *in limine* hearing Defendants again attempted to elicit precise information regarding Dr. Fajardo's work in connection with other lawsuits. (Tr. at 1039.) Dr. Fajardo had difficulty recalling specific information about his prior participation in other cases. (*Id.*) In their findings of fact, Defendants aver that "[t]he list requested at the deposition has never been provided to defendants' counsel." (Defs.' Findings at 103.) It has been over one year since the filing of Dr. Fajardo's report and nine months since Dr. Fajardo's deposition. Plaintiffs have had ample time to provide Defendants with information regarding the

---

mitted to further question Dr. Fajardo as to that testimony at the *in limine* hearing.

**40.** The court cannot require Dr. Fajardo to identify the etiology with complete certainty where no scientist in the relevant field could make such a determination.

**41.** Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires a proffered expert to disclose "a listing of any other cases in which the witness has testified as an expert at trial or deposition within the preceding four years" within the expert's report.

other litigation that Dr. Fajardo has participated in as an expert. Because Plaintiffs have failed to produce this information, they will be prohibited from relying on Dr. Fajardo's experience in other litigation to argue that Dr. Fajardo's methodology has effectively been subject to peer review. Fed.R.Civ.P. 37(c). As there is no record evidence in support of this factor, it weighs against the admission of the proffered testimony.

### 3. Is There a Known or Potential Rate of Error?

Plaintiffs do not directly address the rate of error issue in their findings of fact and conclusions of law. No rate of error was identified by Dr. Fajardo in his reports, his deposition testimony or his hearing testimony. Defendants argue that Dr. Fajardo's methodology is "prone to huge error." (Defs.' Findings at 101.) Elaborating upon this statement, Defendants note that "Fajardo intellectually recognizes that different organs and tissues have different radiation sensitivities; by employing a method that ignores those distinctions, Fajardo introduces enormous error into his method." (*Id.*) In the sense that Dr. Fajardo is a medical professional giving an opinion based upon his review of relevant clinical records, the court finds the potential rate of error in Dr. Fajardo's "diagnosis" to be negligible. However, aspects of Dr. Fajardo's opinions cross over into the realm of risk assessment insofar as Dr. Fajardo attempts to state with scientific certainty that the test Plaintiffs' neoplasms are the result of exposure to ionizing radiation during the TMI accident. The court finds that in this context the potential rate of error associated with Dr. Fajardo's methodology increases. Dr. Fajardo did not calculate organ dose, evaluate dose-response curves for particular neoplasms, or make reference to the NIH radioepidemiologic tables. A formal risk assessment would have made use of this information.

The court finds the potential rate of error associated with Dr. Fajardo's methodology to be moderately high, although the court has had some difficulty quantifying this factor. Accordingly, this factor will weigh neither in favor nor against the admission of the proffered testimony.

### 4. Were There Standards Controlling the Technique's Operation?

Defendants argue that Dr. Fajardo discarded many standards that should have been used to control the operation of his technique. Specifically, Defendants contend that Dr. Fajardo:

did not make latency periods part of the methodology reported in his timely submission, and when he recognized the issue in his untimely submission, he misused the minimum latency periods[;]

. . . . .

does not recognize the distinctive does response curves for different types of cancer[;]

. . . . .

does not calculate organ dose levels[;]

. . . . .

has no methodological step that accounts for the possibility that an unknown etiology caused the plaintiffs' neoplasms[;]

. . . . .

does not account for many risk factors that were relevant to individual test case plaintiffs.

(Defs.' Findings at 102.) The court agrees with Defendants that Dr. Fajardo's timely filed report provides little explanation of any standards that Dr. Fajardo might have employed. Dr. Fajardo's deposition testimony provides some clarification of this issue. With respect to taking potential risk factors into account, Dr. Fajardo testified that he "did take other factors into account." (6/7/95 Fajardo Dep. at 129.) He qualified this assertion by noting he did not "know if [he] . . . took into account every one of the many, many factors that have been considered by everybody . . . [b]ut the main factors that may influence cancer risk were taken into account." (*Id.*) Dr. Fajardo also indicated during his deposition that he did consider relevant latency periods in reaching his final opinion. (*Id.* at 89.)

The court finds that there is evidence on the record which demonstrates that there were some standards controlling the operation of Dr. Fajardo's technique. Moreover,

the court finds that the two standards employed by Dr. Fajardo were particularly important standards. Defendants take exception with Dr. Fajardo's liberal application of the latency period factor insofar as Dr. Fajardo believes that on an individual basis latency periods may stray quite significantly from the standard periods set forth in the literature. The court finds this argument to go to the weight of the testimony rather than its admissibility. Because the record reflects that Dr. Fajardo did employ some of the more important standards to control his technique, this factor will weigh in favor of the admission of the proffered testimony.

### 5. Is the Methodology Generally Accepted?

The court finds the answer to this question to depend upon how one characterizes Dr. Fajardo's proffered testimony. If Dr. Fajardo's methodology is characterized as a differential diagnosis, the court finds the method to be generally accepted. *Paoli II,* 35 F.3d at 758. The Third Circuit has found that "although differential diagnosis is a generally accepted technique, no particular combination of techniques chosen by a doctor to assess an individual patient is likely to have been generally accepted." *Id.* Thus, this court's inquiry must be flexible. *Id.* "However, to the extent that a doctor utilizes standard diagnostic techniques in gathering this information, the more likely [the court will be] ... to find that the doctor's methodology is reliable." *Id.* The court finds Dr. Fajardo's review of clinical records, ruling out of other potential etiologies, and consideration of relevant latency periods to reflect a generally accepted form of the differential diagnosis technique. Further, the court finds that based upon these considerations, it would be generally accepted for Dr. Fajardo to reach a conclusion that it is more likely than not that the test Plaintiffs' neoplasms resulted from exposure to *ionizing radiation.*

If Dr. Fajardo's methodology is characterized as being more akin to a traditional risk assessment, the court is inclined to find that his methodology is not generally accepted. The technical report of the International Chernobyl Project makes the following observations in describing its rationale in studying malignant neoplasms in the Chernobyl population following the accident:

> In order to determine whether radiation has caused certain health effects it is necessary to compare age and sex matched exposed and non-exposed populations. If there is a statistically significant excess of a health effect in the exposed population, then there is a given probability that the effect is due to radiation.

> . . . . .

> There are many confounding difficulties that arise in radiation carcinogenesis studies. The increased risk of radiation induced neoplasms following radiation exposure is expressed over many decades. During this time, there are likely to be changes in the age structure of the population, changes in exposure to other carcinogens as well as advances in detection and treatment of tumors.

*International Chernobyl Project* at Part F, pp. 382–83. In his hearing testimony, Dr. Fajardo seemed to contend that because he was making a causation determination for an individual rather than an entire population, a somewhat different methodology would apply. (Tr. at 1058.) When asked whether he quantified "the risk that [the test Plaintiffs] ... might have gotten cancer without the radiation exposure," Dr. Fajardo responded that "in order to do that, you have to deal with populations rather than individuals." (Tr. at 1057–58.) After being asked a second time whether he quantified any comparison of risks, Dr. Fajardo testified "I *couldn't.* I don't think what you are proposing is possible, especially for individuals." (Tr. at 1058.)

The court is left to determine whether it is generally accepted for a medical doctor, based upon his examination of clinical records, his ruling out of some other potential causes and his consideration of the relevant latency periods, to determine that a given neoplasm's etiology is exposure to ionizing radiation in an amount greater than 10 cGy. To answer this question, the court refers to NCRP Statement No. 7, issued September 30, 1992, entitled "The Probability that a Particular Malignancy May Have Been Caused by a Specified Irradiation." According to the NCRP:

Ionizing radiation is not generally known to leave a characteristic marker in those cells that are malignantly transformed and ultimately destined to become an overt malignancy. Thus, the most comprehensive medical examination, and accompanying laboratory tests done on a patient with a malignancy, however valuable they may be in determining the type and extent of the malignancy as well as its optimal treatment and prognosis, rarely provide definite information as to causation. *As a result, it is not possible, on the basis of medical evaluation, to unequivocally prove or disprove a claim that a specific malignancy was caused by a specified radiation exposure.* Therefore, another basis for judgment as to causation of the malignancy must be sought, despite the fact that new developments in molecular biology may ultimately link specific cancers with specific radiation exposures.

NRCP Stmt. No. 7 at 1.[42] The court finds that insofar as Dr. Fajardo claims that he can with medical certainty identify the etiology of a specific neoplasm as exposure to ionizing radiation based upon a medical evaluation, his methodology is not generally accepted. 1/30/96 Fajardo Aff. To this extent, the factor weighs against the admission of the proffered testimony. Because the court finds that Dr. Fajardo does not claim to have made an unequivocal determination, his methodology appears to be a hybrid of accepted and unaccepted methodologies. As such, this factor will weigh neither in favor nor against the admission of the proffered testimony.

### 6. Is There a Relationship Between The Technique and Methods That are Established to be Reliable?

As reflected in the court's discussion of the previous *Paoli II* factor, whether Dr. Fajardo's technique resembles accepted methods depends upon how his technique is characterized. As a differential diagnosis, the technique resembles accepted techniques; as causal analysis, it does not. Because the method bears some resemblance to accepted methods, the court will weigh this factor in favor of the admission of the proffered testimony.

### 7. What are the Qualifications of the Expert Based upon the Methodology?

The parties and the court agree that Dr. Fajardo is a highly respected and eminently qualified radiation pathologist. Accordingly, this factor weighs in favor of the admission of the proffered testimony.

### 8. Are there Non–Judicial Uses of the Methodology?

Plaintiffs contend that "Dr. Fajardo performs differential diagnoses in his everyday practice of medicine" (Pls.' Findings at 116.) The record evidence indicates that although Dr. Fajardo does regularly perform differential diagnoses, this is the first time that he has used a differential diagnosis to find a causal link between alleged exposure to radiation and the subsequent development of certain neoplasms. Thus, the court cannot find that Dr. Fajardo uses the precise methodology employed in this case on a regular basis. This factor will weigh against the admission of the proffered testimony.

### 9. Conclusion

The *Daubert/Paoli II* analysis weighs in favor of the admission of the proffered testimony. Further, the court notes that in *Paoli II* the Third Circuit characterized the testimony of two physicians who opined as to the causal link between certain health effects and exposure to PCBs as a differential diagnosis. *Paoli II*, 35 F.3d at 752–60. Accordingly, this court finds that it is not inappropriate to characterize Dr. Fajardo's opinion as a differential diagnosis. The court has some concern that scientifically, the causal link between PCBs and future health effects may be more readily apparent than the link between radiation exposure and the development of certain neoplasms. Insofar as this is true, it would seem less appropriate to rely solely upon a differential diagnosis to make the

---

**42.** Reports of the NCRP have been recognized as authoritative by courts insofar as the NCRP is "composed of many of the most eminent scientists in this field in the United States." *Johnston v. United States*, 597 F.Supp. 374, 391 (D.Kan. 1984). This court, likewise, finds the instant NCRP report to be authoritative.

causal link between radiation and a subsequent neoplasm. Having no knowledge of the science relating to PCBs as carcinogens or promoters of other negative health effects, the court is not in a position to distinguish *Paoli II*.

Based upon the foregoing, the court finds that its Rule 702 analysis weighs in favor of admitting Dr. Fajardo's proffered differential diagnosis testimony. The court feels constrained by the legal precedent to find that the issue of whether it was appropriate to use a differential diagnosis in this context goes to weight rather than to admissibility.

### 10. Rule 702 "Fit" and Rule 403

Defendants argue that the proffered testimony does not have the requisite "fit" with the instant litigation for two reasons. First, Defendants contend that if Dr. Fajardo's methodology were found to be reliable, "it would depend upon proof of dose to the organ or tissue of interest, not just evidence of dose to the entire population." (Defs.' Findings at 97.) Because, Defendants claim, Plaintiffs have no evidence regarding organ doses to each test Plaintiff, Dr. Fajardo's methodology cannot be applied to this case. The court has found Dr. Fajardo's proffered testimony to be scientifically reliable pursuant to *Daubert* and *Paoli II* despite the lack of organ dose information. As such, the court finds Defendants' first argument to be moot.

Second, Defendants argue that "[Dr.] Fajardo's 10 rem level is a vehicle for ruling out the possibility of radiation causation, but is, by his own acknowledgment, useless for ruling causation in for the specific cancers at issue." (Defs.' Findings at 97.) Even if Defendants' statement is true, the court finds that it is not relevant to the fit issue. Whether all of Plaintiffs' evidence supports a finding of specific causation for each of the test Plaintiffs is a question to be answered at the summary judgment stage or the conclusion of trial. At this stage, the court finds the testimony to "fit" because it will assist the jury in reaching the ultimate issue of whether Plaintiffs suffered damages as a result of exposure to ionizing radiation during the TMI accident. The court can find no legal support for the proposition that each

causation expert must opine as to both general and specific causation. Further, the purpose of the *in limine* process is not to determine whether Plaintiffs have met their burden for producing sufficient evidence to support the causation aspect of their case. Accordingly, the court finds Defendants' second argument to be misplaced at this stage in the proceedings.

Finally, the court notes that it finds that the proffered testimony is not exceptionally confusing and thus does not warrant exclusion pursuant to Rule 403 of the Federal Rules of Evidence. Based upon the foregoing, the court will admit the proffered testimony of Dr. Fajardo. At trial, Dr. Fajardo will be confined in his testimony to matters covered in his timely filed report and his deposition. The court stresses that it will not liberally construe this ruling—anything not specifically addressed in the timely report or deposition is inadmissible.

## V. *Conclusion*

In accordance with the foregoing discussions, the court will exclude certain of Plaintiffs' untimely filed expert reports; grant in part and deny in part Defendants' motion for reconsideration of the court's January 5, 1996 memorandum and order as it pertains to Professor Shevchenko; deny in part Defendants' motion *in limine* to exclude the Wing cancer incidence study; and grant in part and deny in part Defendants' motion *in limine* to exclude Plaintiffs' experts on medical causation. The court will issue the balance of its *in limine* opinion, pertaining to Thomas Winters, Sigmund Zakrzewski, Theodore Sterling and David Lochbaum on or before April 5, 1996. An appropriate order will be issued.

### *ORDER*

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT:**

1) All supplemental affidavits filed after January 5, 1996, are excluded;

2) Supplemental affidavits filed subsequent to the March 1, 1995 filing deadline and prior to January 5, 1996, are admitted to

the extent stated in the accompanying memorandum of law;

3) Defendants' motion for reconsideration of the court's January 5, 1996 ruling regarding Professor Shevchenko is **GRANTED IN PART,** and Professor Shevchenko will be precluded from testifying as to quantified dose estimates based upon the tree study and cytogenetic analysis;

4) Defendants' motion for reconsideration of the court's January 5, 1996 ruling regarding Professor Shevchenko is **DENIED IN PART,** and Professor Shevchenko will be permitted to testify as to the results of the cytogenetic analysis and as to his observations of morphological damage to trees in the TMI area;

5) Defendants' motion *in limine* to exclude Plaintiffs' dose experts is **DENIED IN PART** as to the Wing cancer incidence study, and Dr. Wing will be permitted to testify to the extent stated in the accompanying memorandum of law, and this court's memorandum of law dated January 5, 1996;

6) Defendants' motion *in limine* to exclude Plaintiffs' dose experts is **GRANTED** as to Dr. Olga Tarasenko;

7) Defendants' motion *in limine* to exclude Plaintiffs' experts on medical causation is **GRANTED** as to Dr. Bruce Molholt;

8) Defendants' motion *in limine* to exclude Plaintiffs' experts on medical causation is **DENIED** as to Dr. Luis Fajardo;

9) The court's orders directing that no filings be made without express leave of court remain in effect until the balance of the court's *in limine* ruling is issued.